In the Matter of the Petition of EDWARD J. FLANAGAN to Render and Settle His Account as General Guardian of JAMES MORRIS, JOSEPH MORRIS and MARIE MORRIS, Infants.

Surrogate's Court, Kings County, June 6, 1929.

*Edward J. Flanagan,* special guardian of Morris infants, for the petitioner.

WINGATE, S. This is a proceeding by a general guardian for the final judicial settlement of his accounts. In the usual case such an application would be unmomentous routine, but this petition presents two features which raise it from the plane of the commonplace to a position of distinct legal interest, one of the questions involved being, apparently, of first impression in any common-law court. The questions involved are, *first,* as to the jurisdiction of the Surrogate's Court to render an affirmative judgment in favor of a guardian and against a ward for moneys expended by the guardian out of his own pocket in excess of the income from the ward's property for the support, maintenance and education of the ward; and, *second,* as to the right of a guardian

to an affirmative judgment against a ward for commissions when he has expended all income received for the benefit of the ward and there is no present fund in his possession from which such payment can be made.

The period during which the guardian has acted as such, in this case, covers a term of almost twelve years. His accounts, the items of which are in no way contested, show, in most minute and satisfactory detail, this long-continued service. In conjunction with the other facts in the case, they further demonstrate an extremely high standard of painstaking service and conscientious endeavor in the conservation of the interests of the infants. At the time of the appointment of the guardian, the estate of the infants consisted of a small amount of cash and two parcels of tenement house property. The latter were in an extremely dilapidated and run down condition, largely vacant and practically unrentable in their existing condition. To make the situation more desperate, mortgage foreclosure proceedings were pending. One of these properties was advantageously sold by the guardian, pursuant to legal proceedings duly had for that purpose, the remaining parcel being refinanced by him, reconstructed and turned into a desirable and profitable holding. The incumbrances on this property have been gradually reduced until they now stand at a comparatively nominal amount.

Two years after the appointment of the guardian, the mother, and only surviving near relative of the infants, died, since which time he has stood in *loco parentis* to them, supervising their care and education and bringing them to the threshold of useful man and womanhood. The income of the estate proved insufficient for defraying the necessary expenses of the care, maintenance and education of the infants. Instead, however, of applying to the court for permission to sell their sole remaining tangible inheritance for the purpose of raising money for this entirely necessary and proper object, the guardian made up the deficiency out of his own pocket, expending from his own funds the sum of $2,313.75 for the benefit of his wards. As a result, the parties are now before the court with the infants owning a valuable property, which should return them a generous income through life, but with this indebtedness to the guardian for moneys expended for their care. The guardian having no estate funds in his hands has petitioned the court, in connection with the judicial settlement of his accounts, for an affirmative judgment against his former wards, who have now reached majority, for the sum which he has concededly spent out of his own pocket for their upbringing. He asks no interest on this sum, but does request an allowance of the commissions

to which he would be entitled were there moneys in his hands from which to pay them. The citations which have been served upon the former wards gave abundant notice of the fact that such additional prayer was contained in the petition. The wards have entered no appearance on the return of the citation so that the question is presented to the court, virtually as in an *ex parte* matter, whether the relief sought can and should be granted.

There can be no possible question as to the propriety of the judicial settlement of the accounts of the guardian as rendered, but the affirmative decree prayed presents a problem which requires serious consideration. Has the Surrogate's Court jurisdiction to render affirmative relief of the nature here sought?

It is fundamental that the court cannot acquire jurisdiction by consent or acquiescence (*Matter of Brennan*, 129 Misc. 283; *Matter of Matthewson*, 210 App. Div. 572), so that the prayer of the guardian and the absence of objection by the wards does not aid in the determination.

There is controlling authority to the effect that had the question arisen prior to the amendment of section 40 of the Surrogate's Court Act by chapter 439 of the Laws of 1921, the court, irrespective of the manifest equities of the case, would have been compelled to hold that it was without power to afford the affirmative relief to which the guardian is obviously entitled. (*Matter of Underhill*, 117 N. Y. 471; *Matter of Lang*, 144 id. 275.) The facts in the instant case cannot, as to any material matter, be distinguished from those presented in the two determinations of the Court of Appeals, just cited. In the *Underhill* case the learned court notes (at p. 476): " It is said that it would result in an unnecessary amount of litigation to hold that the surrogate has not the power contended for, as, in such case, the executor must sue the legatee and go into another accounting for the purpose of showing the overpayment, or, if the decision of the surrogate, as to the amount, should be regarded as *res adjudicata*, then it would be a case of an action at law to recover back an excess of payment, the amount of which was already conclusively established by the surrogate's decree, and, therefore, a party ought not to be denied a remedy over at once against the legatee by the recovery of an affirmative judgment against such legatee in the proceeding for an accounting by the executor. The argument, from the convenience of the remedy, might well be addressed to the Legislature. The only question for us is, whether such a remedy has been given."

The same opinion reads (at p. 478): " This power to give judgment and award execution for the collection of the money paid to the legatee in excess of the legacy I do not find bestowed upon

the surrogate, and it is of such a nature that, without some language bestowing it upon this tribunal of peculiar and limited jurisdiction, it would not otherwise possess it. The surrogate, by virtue of his power to direct and control the conduct of executors, could, as I think, direct the executor to enforce the collection of the debt from the legatee by a common-law action. It would unquestionably be convenient for the surrogate to possess the jurisdiction as argued by the appellant. * * * But it does not seem to us that the jurisdiction has been given."

In determining the question of the powers of the Surrogates' Courts under the present section 40 of the Surrogate's Court Act, a review of the probate history of the territory now embraced within the State of New York becomes of more than academic interest as throwing some possible light upon the legislative intention, since it is fundamental that the provisions of a statute " must be read in the light of its history and purpose " (*Matier of Frasch*, 245 N. Y. 174), and this history will be briefly considered.

In 1621 the States General of Holland granted an exclusive charter or patent, running for twenty-four years, to the Dutch West Indies Company, a commercial corporation of Holland, empowering it to found colonies and carry on trade in various parts of the world, notably on the coasts of North America. This grant carried with it full administrative and judicial powers in any colonies which might be founded. (Lincoln Const. Hist. N. Y. 454; 1 Brodhead Hist. N. Y. 134; 1 O'Callaghan Document. Hist. N. Y. 184; Daly Preface to 1 E. D. Smith's Rep. XVIII–XIX; Charter, art. 2; Daly in McAdam's compiled edition of the Bench and Bar of New York, 2.) The first permanent colonization of the territory now embraced in the State of New York was effected in 1623 (Lincoln, 454), when thirty families were brought over and settled on the lower part of Manhattan Island. (1 Stiles Hist. Brooklyn, 25; Lincoln, 455; Daly Preface, XVIII; Daly [McAdam ed.], 4.)

The broad judicial and administrative powers possessed by the West Indies Company under its charter were delegated by it to the successive Governors whom it sent to the new colony, but the manner of their execution under the early incumbents of the office is shrouded in obscurity, since the records of their administrations were destroyed during the early part of the 19th century. (Daly Preface, XIX; Lincoln, 455; Daly [McAdam ed.], 4.) It is known, however, that under the third and fourth Governors, Minuit and Van Twiller, executive and judicial powers, including matters pertaining to the estates of decedents, were exercised by the Governor, assisted by a council of five chosen by him, and an

official entitled the " Scout Fiscal," appointed by the West Indies Company, who " was a kind of Attorney General, uniting with the power of a prosecuting officer, the executive duties of a sheriff." (4 O'Callaghan, 69; 1 Col. Doc. 160; Albany Rec. 20–61; Lincoln, 455; Daly [McAdam ed.], 5, 6.)

This method of administering justice continued up to the time of Governor Stuyvesant, who established a new tribunal, known as the " worshipful court of the schout, burgomaster and schepens " on February 2, 1653, pursuant to a provisional order of the Dutch States General made in 1650.   (1 N. Y. Rec. of Burgomasters & Schepens, 3;  1 O'Callaghan, 599;  Brodhead, 548;  Daly Preface, XXIV.) All of the members of this tribunal were appointed by the Governor and all matters of a judicial nature, including the probate of wills, the granting of intestate administrations, etc., were passed upon by it.   (2 O'Callaghan, 210; Valentine Hist. N. Y. 53; 1 Stiles, 221; Brodhead, 548, 674; *Matter of Brick*, 15 Abb. Pr. 12, 18; Daly's Judicial Tribunals, 17, 18.)   Similar courts were established on Long Island, at Gravesend, on December 19, 1645 (1 O'Callaghan, 630; Gravesend Records; 2 Thompson, 62; 1 Ross Hist. Long Island, 361), at Breukelen in 1646, at Midwont (Flatbush) and Amersfort (Flatlands) in 1654 and at Boswyck (Bushwick) and New Utrecht in 1661.   (Stiles Hist. Brooklyn, 25, 339; 4 N. Y. Col. MSS. 276; 1 O'Callaghan, 388; 1 Brodhead, 421, 422; 9 Dutch MMS. 570.) This system of procedure continued until the capture of the colony by the English on September 6, 1664.   (Daly [McAdam ed.], 31; 1 Stiles, 221.)

The first English occupation lasted for nine years, terminating on July 30, 1673.   During this period, probate matters, under the code drawn up by Clarendon, then lord chancellor of England, were attended to in the Courts of Sessions, of which three were established in the province.   These courts also possessed full civil and criminal jurisdiction.   (1 Colonial Laws N. Y. 8 *et seq.*)

The period of the second Dutch occupation, which lasted less than a year, was so brief that it possesses no historical interest and, indeed, little is ascertainable respecting its judicial history.   Such scanty information as is available indicates, however, that there was no material alteration effected in the system of tribunals established by the English.

With the resumption of the English hegemony in 1674, the final and most interesting period of colonial judicial history opens. At first, the same tribunals which had been set up during the former English occupation, were continued (Stiles, 168), but among the instructions given Governors Dongan and Slaughter were included directions that they should assume the ecclesiastical

jurisdiction of the Archbishop of Canterbury, and the Bishop of London, respectively, relating to matters of probate and administration. (3 Col. Doc. 372, 688, 820.) As a result, all matters relating to the estates of decedents passed into the hands of the successive Governors, there to remain until the adoption of the first State Constitution in the early days of the Revolution. Whereas the powers respecting decedents' estates were vested in the Governors themselves, the actual exercise of these powers was intrusted by them to delegates, the Deputy Secretary usually being named as such. Dr. Bridges, afterward appointed chief justice, was named as delegate by Governor Cornbury in 1692, and it was he who first introduced the title of surrogate by adding it to his signature of official documents. (Redfield [McAdam ed.], 79; *Matter of Brick*, 15 Abb. Pr. 12, 22.) All letters testamentary were issued in the prerogative office in New York city in the name of the Governor under the prerogative seal, and the whole was recorded in the Prerogative Court located in the office of the Governor.

As the colony grew in population, it was found convenient from time to time to appoint local delegates in some of the outlying counties, but such appointees were vested with extremely limited powers, and really did little more than transmit proceedings to the Governor's deputy in New York for determination. Such was the system in vogue at the outbreak of the Revolution. (Report of Gov. Tryon, June 11, 1774; 8 O'Callaghan, 434; London Documents, XLIV; New York Documents, CLXVI; Letter of Philip Livingston, Jr., to Earl of Hillsborough, Sept. 11, 1769; 8 O'Callaghan, 187; London Documents, XLII; N. Y. Papers [S. P. O.], CLXI; Report of Gov. Tryon to Privy Council, Dec. 1, 1772; 8 O'Callaghan, 322; London Documents, XLIII [N. Y. Papers, Bundle V-V]; Lords of Trade to Privy Council, 8 O'Callaghan, 413 [N. Y. Entries LXIX, p. 21]; 4 O'Callaghan, 25, 28 [New York Papers III E. 38]).

It will be seen from the foregoing review that from the days of the first Dutch settlement to the time of the adoption of the Constitution of 1777, matters affecting decedents' estates had been handled by two and only two varieties of tribunals, namely, *first*, by courts of general jurisdiction who had full power to decide questions of every nature which might arise in any proceeding, and, *secondly*, by the Dutch and English Governors, or their immediate delegates and representatives, who, as vice-gerents of the supreme or sovereign power, possessed even less limited authority. Under neither system could any question of conflicting jurisdiction arise, and the respective authorities were empowered to, and unquestionably did determine all matters arising in or growing out of the proceedings.

The American Revolution, in the last analysis, was a revolt against superior authority — against powers derived from above as distinguished from those granted by the people themselves, and it is a matter of record that one of the chief sources of the discontent of the colonists was the jurisdiction exercised in higher judicial matters under the authority of the Crown. This animosity evinced itself with particular poignancy against the powers of the chancellor, but it is reasonable to assume that a measure of this popular dis-approval was shared by the other judicial function of the Governor connected with decedents' estates.

Whatever the cause, courts of probate jurisdiction promptly became the stepchildren of the judicial system, the Legislature apparently being most fearful lest they be granted too great powers. The folly and inconvenience of such limitations has more and more impressed itself upon the citizenry and their elected representatives, so that, as stated in *Matter of Runk* (200 N. Y. 447, 454), the Surro-gates' Courts have been vested " with constantly increasing powers " and, particularly in recent years, every judicial suggestion of any limitation on their power to fully and completely determine all matters affecting decedents' estates, has been promptly followed by a decisive legislative reversal in the form of a change in, and broadening of, the statutory grant of jurisdiction.

That such a policy is wise and beneficent is scarcely possible of successful contradiction. The proceedings in Surrogates' Courts are informal, looking rather to the substance than to the techni-calitities of the matters pending. The calendars in even the busiest courts are, at all times, substantially up to date, and it is usually possible for a claimant to obtain an adjudication of his rights in fewer weeks than it would take him years in some of the tribunals of general jurisdiction of the State.

While these arguments, based on early history and convenience, may properly be considered as throwing light on the meaning of statutory enactments, neither one would justify this court in assuming jurisdiction in the instant case unless it shall appear that the change in legislative sentiment has reached such a point as to clearly extend the powers of the court beyond the point at which they stood in 1889 when the decision in *Matter of Underhill* was ren-dered by the Court of Appeals. This question will now be considered.

At the time of that decision the jurisdiction of the Surrogate's Court was regulated by the supplemental articles of the Code of Civil Procedure of June 2, 1876, which were enacted by chapter 178 of the Laws of 1880. The particular portions referring to the powers of the surrogate are contained in title I, chapter XVIII, the especially pertinent sections being 2472 and 2481. The former

relates to the " General jurisdiction of surrogate's court," and the latter enumerates the " incidental powers of the surrogate."

Without quoting these enactments *in extenso*, it may be noted that by section 2472 the surrogate is given power " in addition to the powers conferred * * * by special provision of law * * *," to take proof of and probate wills and revoke the same; to grant and revoke letters of administration; to control and settle the accounts of executors, administrators and testamentary trustees; to enforce the distribution of decedents' estates; to charge decedents' realty for payment of debts and funeral expenses; to appoint and remove guardians, supervise their conduct and settle their accounts; the final paragraphs of section 2472 reading: " 6. To administer justice, in all matters relating to the affairs of decedents, according to the provisions of the statutes relating thereto. 7. * * * This jurisdiction must be exercised in the cases, and in the manner prescribed by statute."

The authority granted by section 2481 was merely of such incidental power as would enable the court to function, such as the right to cite parties, to adjourn, to compel its fiduciaries to comply with its orders, etc.

It is, of course, obvious that the jurisdiction granted was extremely limited and that the implied inhibition upon the powers of the court " to administer justice " in any case not strictly " according to the provisions of the statutes," inevitably resulted in many absurdities, circuities and anomalies equally striking with that resulting in the *Underwood* case.

That such a condition would not be permanently tolerated seems to have been apparent to the minds of the courts as is shown in the foregoing citation from the *Underwooa* case: " The argument, from the convenience of the remedy, might well be addressed to the legislature."

That such representations were made from time to time, with increasingly substantial results, is noted by the Court of Appeals in *Matter of Runk* (200 N. Y. 447, 454), which traces the successive legislative grants of jurisdiction to the surrogates.

The final culmination of this process would seem to have been reached in the present statute contained in section 40 of the Surrogate's Court Act, as amended by chapter 439 of the Laws of 1921. So far as here material, this provides as follows:

" Each surrogate must hold, within his county, a court, which has, *in addition* to the powers conferred upon it, or upon the surrogate, by special provision of law, jurisdiction, as follows:

" To administer justice in *all matters* relating to the affairs of decedents, and upon the return of any process to try and *determine*

*all questions, legal or equitable*, arising between any or all of the parties to any proceeding, or between any party and any other person having any claim or interest therein who voluntarily appears in such proceeding, or is brought in by supplemental citation, *as to* any and *all matters necessary to be determined* in order *to make a* full, equitable and *complete disposition of the matter* by such order or decree as justice requires.

" In *addition to and without limitation or restriction on the foregoing powers*, each surrogate or surrogate's court shall have power, in the cases and in the manner prescribed by statute:   *   *   *."

Then follows an enumeration of the general subjects of jurisdiction including probate and construction of wills; administrations on intestate estates; supervision and settlement of accounts of fiduciaries; conservation and distribution of estates, including (under chapter 100 of the Laws of 1924) the recovery of personal property or its proceeds belonging to an estate; and appointment, supervision and settlement of accounts of guardians.

It is believed that no reasonable construction of this statute could be made which did not hold that the Surrogates' Courts now possess entirely unlimited jurisdiction over any and every legal and equitable question which may ever arise in connection with decedents' estates and the relations of guardians and wards so far as it concerns any person actually or constructively before the court by reason of any right in, claim to, or obligation in connection with, a decedent's or ward's estate.

There have been a number of interpretative decisions since this enactment became effective, and a few of these will be briefly reviewed.

In *Matter of Raymond* v. *Davis* (248 N. Y. 67) the Court of Appeals in an opinion dated May 1, 1928, says (at p. 72): " The amendment gives notice that the powers [of the Surrogate's Court] that are specific shall hereafter be read as being ' in addition to and without limitation or restriction on ' the powers that are general   *   *   *.  ' Concentration of jurisdiction as to decedents' estates'   *   *   *   is the purpose clearly revealed in the statutory scheme.  ' The State has empowered surrogates in unmistakable language, and it is not the function of courts to discover or to fashion reasons for thwarting the manifest policy.' "

In *Matter of Akin* (248 N. Y. 202) the same court says in part (at p. 205): " The express grant of power to the surrogate to hear and determine the issue raised by an answer which ' alleges title to or the right to possession of any property involved in the inquiry ' shows a legislative intent that the surrogate should have jurisdiction to determine title to property *in spite of* an assertion

of an adverse claim of title in an answer. * * * If doubt as to the legislative intent had existed before, that amendment (Laws 1924, ch. 100) makes clear that in a discovery proceeding the Surrogate's Court has now jurisdiction to dispose of every claim to property which should be delivered to an executor, administrator or guardian."

This decision appears to overrule by implication the determination of the Appellate Division, First Department, in *Matter of Brazil* (219 App. Div. 594), which is the only discordant note in the harmony of judicial recognition of the expanded power of the Surrogate's Court. The *Brazil* case was decided on the authority of *Matter of Hyams* (237 N. Y. 211), which the Court of Appeals in the *Aiken* case determines to have been superseded by the amendment.

In *Matter of Seaman* (205 App. Div. 681) the Appellate Division, Second Department, in the course of a unanimous opinion, said (at p. 686): " There is another suggestion made in the appellant's reply brief, to the end that the Surrogate's Court has no equitable jurisdiction to dispose of a controversy of this character. With this contention I also disagree, for under the present Surrogate's Court Act (Laws of 1920, chap. 928) that official has power to try all questions, legal and equitable."

In *Matter of Van Buren* v. *Estate of Decker* (204 App. Div. 138) the Appellate Division, Third Department, said (at p. 140):

" The law as it stood prior to October 1, 1921, failed to confer on the Surrogate's Court equitable jurisdiction except upon the particular subjects specified in section 2510 of the Code of Civil Procedure * * *. By section 40 of the Surrogate's Court Act, as amended by chapter 439 of the Laws of 1921, the limitation or restraint as above described was removed. The parties in the case at bar before the court are the creditors of Decker and the petitioner. The fund whether it belonged to Decker or to the partnership of Decker & Van Buren is also in court.

" The court having jurisdiction both of the parties and of the fund has power to make a determination of the petitioner's claim to any partnership property whose title is involved in the proceeding in the Surrogate's Court."

Other decisions enunciating and applying similar principles under varying states of fact are *Matter of Beach*, decided by the surrogate of Cattaraugus county (122 Misc. 261), and affirmed by the Appellate Division, Fourth Department (208 App. Div. 831); *Matter of Ehlers*, arising in Albany county (133 Misc. 424); *Matter of McGrath*, New York county (Id. 30); *Matter of Sanders*, Clinton county (131 id. 266); *Matter of Malone*, Albany county

(128 id. 288); *Matter of Frame*, New York county (Id. 788); *Matter of Brown*, Westchester county (129 id. 293); *Matter of Bunimowitz*, Bronx county (128 id. 518); *Matter of Wiemann*, New York county (119 id. 239); *Matter of Hawes*, New York county (Id. 359), affirmed by the Appellate Division, First Department (212 App. Div. 861), and *Matter of Koehler*, New York county 134 Misc. 532).

I am, therefore, satisfied that this court has unquestionable jurisdiction and ample power to render an enforcible decree for the repayment by the wards of the moneys advanced by the guardian for their care, education, maintenance and support.

There remains for determination the question of the right of the guardian to receive commissions in the absence of funds in his hands from which to make their payment. It is a commonly accepted legal thesis that where a fiduciary fails to exact payment of his commissions from the funds of the estate as they currently come into his hands, he is deemed, as a matter of law, to have waived them. The decisions most frequently cited as making this determination are *Spencer* v. *Spencer* (38 App. Div. 403), decided by the Appellate Division, Second Department, in March, 1899, and *Olcott* v. *Baldwin* (190 N. Y. 99), decided by the Court of Appeals on November 19, 1907.

Both of these cases were concerned with trustees administering testamentary trusts for life tenants with remainders over to others. Since the legal relationship between the parties in such cases differs in many material respects from the relationship between guardian and ward, it will be of advantage to determine whether the *ratio decidendi* of the courts in those cases is equally applicable to the relationship now before the court.

The basis of the decision in *Spencer* v. *Spencer* (*supra*) is given (at p. 412) as follows: "The difficulty in his case is not that he did not take his commissions each year from income, but that he paid over the whole income to the beneficiary. He was not put to the alternative of either taking his commissions or paying the amount to the beneficiary; there was a third course open to him — that was to retain the amount of his commissions in the trust. The income was the sole fund from which the trustee's commissions were payable; he could not by paying over to the *cestui que trust* the amount of the commissions in one year create a charge or lien on the income of the beneficiary in future years. The interest of the beneficiary in the rents and profits was, by the express terms of the statute, incapable of anticipation or assignment; and neither the acts of the trustees or of the *cestui que trust* could avoid this provision. We do not mean to say that this rule

is to be carried so far as to exclude the possibility of any unintentional error resulting in an overpayment in one year being corrected in the next. But in this case the trustees have for nine successive years rendered their accounts to the beneficiaries without claim for commissions, and have paid over the whole net income. By this course they have lost the right to commissions."

In *Olcott* v. *Baldwin* (*supra*) the Court of Appeals quotes with approval the language from *Spencer* v. *Spencer*, just given, holding that it was applicable to a case where the testator had created the trust fund for the maintenance of one of his daughters. The opinion reads in part (at p. 110): " The result of the trustees paying to her the full income for eighteen years without deducting their commissions and then reserving to themselves the entire income until the commissions so accumulated were paid, would be to give the beneficiary years of plenty followed by a period when her income would be entirely withheld. Such an allowance of commissions at this time would interfere with the plain purpose of the will."

A relaxation of the strict rule of waiver which might be spelled out of these cases, and others decided upon their authority, is given in *Matter of Slocum* (60 App. Div. 438), also decided by the Appellate Division, Second Department. The opinion reads (at p. 445): " That is to say, they cannot pay the income in full and deduct commissions on such income from the principal where the income goes to one set of beneficiaries and the principal to another. By paying in full without retaining the commissions, where such commissions if afterwards collected would be charged upon other beneficiaries, the right is clearly waived."

All the decisions in which this doctrine of implied waiver has been applied have been cases of trusts, involving either the rights of third parties or the question of income from a fund for the mainte-nance of the *cestui que trust*, and a most exhaustive search has failed to disclose an instance of its application to the relationship of guardian and ward.

There is ample reason for invoking such a principle in the cases to which it has been applied, but such reason fails in the relationship under consideration. In a case like the present, the entire estate, both principal and income, is the absolute, vested property of the ward, possession only being postponed for the protection of his best interests. Naturally, so far as possible, this property should be conserved, but it is all dedicated to the support, maintenance and advancement of the interests of the ward, and, where the necessity is demonstrated, permission to use the principal for such purposes will be granted. If such an application had been

made in the course of this proceeding, it would unquestionably have been granted, and it cannot make any practical difference when the matter is viewed from an equitable standpoint, that the application is to all intents and purposes made after the event instead of prior thereto. These infants stood in imperative need of two things, *first*, maintenance and education, and, *second*, intelligent supervision over and conduct of their material affairs. Both were necessaries. The former they received, in some measure at least, from the personal funds of their guardian; the latter they received wholly at the expense of the time and effort of this guardian. We have held that he can recover for the former, and since the rights of no third parties are involved, it would seem equally obvious that he should receive a return for the latter. Such return is legally measured in commissions, and, under the facts here present, it is determined that the guardian is entitled to such commissions.

The guardian has intimated his intention, after the determination of the questions here involved, of waiving the sum allowed him as commissions, cutting the principal indebtedness in half and giving his former wards an extended period within which to make payment. Such action on his part, if taken, would be quite consistent with his conduct during the entire period of his incumbency of the office, but can in no way affect the strict rights of the parties.

It is, therefore, found that the guardian is entitled to a personal decree against his former wards, both for the sum which he is shown by his accounts to have advanced for their education and support, and, also, for his commissions and the reasonable costs and expenses of this proceeding.

Submit decree accordingly.