In the Matter of the Estate of LOUISE V. WELTON, Deceased.

Surrogate's Court, Kings County, October 29, 1931.

*Robert K. Story,* for the petitioners.

*Dean, King, Smith & Taylor,* for Lawyers Trust Company, respondent.

WINGATE, S. The ancient adage addressed to the shoemaker, admonishing of the wisdom of each individual adhering to his familiar occupation, was never better illustrated than by the facts of the case at bar. The petitioners in the present proceeding, although laymen, have attempted to act as their own counsel in the settlement of the affairs of this estate, and most, if not all, of their not inconsiderable present difficulties are attributable to this cause.

The decedent died on November 18, 1925, leaving no husband, children or issue of deceased children. She was survived by a brother, John B. Stewart, who is one of the petitioners herein, and by a sister, Dorothy Bashford, who is the wife of Ernest N. Bashford, the other petitioner. The decedent had had another brother, who predeceased her, leaving no issue. Prior to his death however, he had legally adopted one Frances Stewart.

Letters of administration upon the estate were issued to the petitioners on December 29, 1925, and they duly qualified by filing a bond in the sum of $25,000 with National Surety Company as surety.

In the spring of 1926 the petitioners, laboring under the belief that this adopted daughter of decedent's deceased brother was one of the next of kin, drew two checks on the funds of the estate, respectively in the sum of $5,000 and $2,000, for the purpose of making a distribution to her. It is alleged in the petition that these checks were drawn at the direction of and were countersigned by the resident vice-president of the surety company, and left with him for transmission to the payee, and that the petitioners, who, as stated, were not represented by counsel, relied on the National Surety Company and its representative for legal guidance. The funds of the estate were deposited with the respondent, Lawyers Trust Company. The larger of the two checks admittedly reached the hands of the attorney in fact for Frances Stewart, but receipt of the $2,000 check is emphatically denied, and as its amount was charged by the Lawyers Trust Company against the estate account, the inference is drawn that the trust company paid the $2,000 check on a forged indorsement.

Relief is sought in the alternative against the distributee, Frances Stewart, or her attorney in fact, against the surety company, and to the extent of the $2,000 sum, against the Lawyers Trust Company.

It is admitted by the accountants that any distributive payment to the adopted daughter of the deceased brother was improper and this is clearly so, as she was not a next of kin of her adoptive father's sister. (*Hopkins* v. *Hopkins*, 202 App. Div. 606; affd., 236 N. Y. 545; *Winkler* v. *N. Y. Car Wheel Co.*, 181 App. Div. 239; *Matter of Hall*, 141 Misc. 169.) It is claimed, however, that such payment was made " under a mistake of fact " which is the basis on which recovery against her, or her attorney in fact, is prayed.

The grounds for relief against the surety company are not clearly defined but seem to be founded either on the theory that it undertook to advise the petitioners on the subject of the administration of the estate and misled them, or that some rather intangible species of coercion was exercised which induced the payment.

The grounds for recovery against the trust company are obviously predicated on its apparent failure to make payment of the $2,000 check to the payee named therein. If it were to be established on a trial that the administrators drew a check on the trust company for $2,000, payable to Frances Stewart; that this check was not paid to or by her order, but that its indorsement was forged and that this respondent paid the proceeds of such check to or on the order of the forger and charged the amount to the petitioner's account, the liability of the trust company would be *prima facie* established, since it is primary that a payment under such circumstances does not relieve the bank and that it remains liable for the amount of the check thus wrongfully paid. (*Shipman* v. *Bank of State of New York*, 126 N. Y. 318, 327; *Paton & Co., Inc.*, v. *Guaranty Trust Co.*, 227 App. Div. 545; affd., 254 N. Y. 621.)

The power of this court to determine the liability, if any, of the Lawyers Trust Company to the estate is, however, challenged. Although duly cited on the accounting, and given notice by the statements of the account of the relief sought, it has appeared specially for the sole purpose of contesting the jurisdiction of the court.

It has thus demonstrated a preference that the question of its liability be adjudicated in a court of general jurisdiction despite or on account of the necessarily attendant delay of from two to three years, with its consequent expense and embarrassment to the estate. Its special appearance would seem to have been dictated by a counsel of excess caution. If the court does not possess inherent jurisdiction in the premises, power to adjudicate could not be con-

ferred by an express consent of parties (*Davidsburgh* v. *Knicker-bocker Life Ins. Co.*, 90 N. Y. 526, 530; *Cooper* v. *Davis*, 231 App. Div. 527, 529, 530; *Matter of Matthewson*, 210 id. 572; *Matter of Walker*, 136 N. Y. 20; *O'Donoghue* v. *Boies*, 159 id. 87, 90; *Matter of Morris*, 134 Misc. 374, 376), much less by a general appearance.

In support of its challenge, the trust company cites only *Matter of Brazil* (219 App. Div. 594), decided by the Appellate Division for the First Department in March, 1927. Even a casual reading of the opinion there rendered demonstrates, however, that it is not a controlling precedent upon the facts here existing. In view of the many subsequent apparently basicly conflicting utterances of the Court of Appeals and of the Appellate Divisions of other departments, it may well be doubted whether this decision would be considered to represent the law even in the First Department where it was decided. In any event it purported to pass only on facts materially different from those of the instant case. The question there adjudicated was whether the surrogate, in a discovery proceeding, had the power to direct a bank to turn over to an executor moneys deposited by the testator in his lifetime in a tentative savings bank trust. The decision was to the effect that no such power existed. Perhaps such determination may have been a correct decision of the precise question then presented, although it is a more or less cogent circumstance in this connection, that only a single authority is cited in its support, and that such precedent was admittedly overruled by the amendments to the Surrogate's Court Act effected by chapter 100 of the Laws of 1924. However this may be, the legal question here presented is raised by materially different facts. In the case at bar the estate fiduciaries, acting in their official capacity, took estate funds to the respondent depositary and placed them in its custody for the account and benefit of the estate. Obviously, the bank was put on direct notice that the property confided to it constituted trust funds for which the depositors were accountable in the Surrogate's Court of their appointment, and that the fund itself was, in usual course, within the direct and especial jurisdiction of such Surrogate's Court.

As a matter of law, the depositary was further charged with notice of the powers expressly granted to the Surrogate's Court, which include powers:

"To administer justice in all matters relating to the affairs of decedents, and upon the return of any process *to try and determine all questions, legal or equitable,* arising between any or all of the parties to any proceeding, or between any party and any other person having any claim or interest therein who voluntarily appears in such proceeding, or is brought in by supplemental citation, *as to any*

*and all matters necessary to be determined in order to make a full, equitable and complete disposition of the matter by such order or decree as justice requires."* (Surr. Ct. Act, § 40.)

" To direct and control the conduct, and settle the accounts, of executors, administrators, and testamentary trustees; * * *." (Surr. Ct. Act, § 40, subd. 3.)

" *To enforce against a respondent* the delivery of personal property, or *the payment of the* proceeds or *value of personal property belonging to* or withheld from *an estate.* (Surr. Ct. Act, § 40, subd. 4.)

The question of what is meant by " personal property " is not left to conjecture in its general use in the Surrogate's Court Act, since, in section 314, the Legislature has expressly indicated the meaning to be given to the phrase. It was there enacted that " In construing the provisions of this act, the following rules must be observed, except where a contrary intent is *expressly declared* in the provision to be construed, or *plainly apparent* from the context thereof: * * *

" 2. The word ' assets ' signifies personal property applicable to the payment of the debts and funeral expenses of a decedent." (Italics not in original.)

" 13. The expression, ' real property,' includes every estate, interest, and right, legal or equitable, in lands, tenements, or hereditaments, except those which are determined or extinguished by the death of a person seized or possessed thereof, or in any manner entitled thereto, and except those which are declared by law to be assets. * * * The expression, ' personal property,' signifies every kind of property which survives a decedent, other than real property as defined in this subdivision, and includes a right of action conferred by special statutory provision upon an executor or administrator."

The composite result of these legislative directions is that in an interpretation of the language of the Surrogate's Court Act, a court " *must* " construe " real property " to be every interest of the decedent in lands which survives his death and has not been determined to be personal property not exempt from payment of debts and funeral expenses; and " *must* " construe " personal property " to be every other species of property which survives a decedent. The only exceptions to this rule of construction, which is made mandatory upon every court by the direct fiat of the Legislature, are: *First,* that a contrary intent be " expressly declared in the provision to be construed," or, *second,* that such contrary intent be " *plainly apparent* from the context thereof." (Italics not in original.)

To determine whether either of these two sole exceptions is

applicable in construing the provisions of section 40 requires a study of the language used therein and of the intent of the Legislature in formulating the enactment.

Turning to the pertinent portion of subdivision 4 of section 40 of the Surrogates' Court Act, the powers expressly granted to the court are: "4. To enforce the payment of debts and legacies; the distribution of the estates of decedents; and the payment or delivery, by executors, administrators, and testamentary trustees, of money or other property in their possession, belonging to the estate or fund. 5. To enforce against a respondent the delivery of personal property, or the payment of the proceeds or value of personal property belonging to or withheld from an estate."

This provision may be searched in vain for any *express declaration* of a legislative intent to consider the " personal property " therein referred to in a light different from that described in the comprehensive definition of subdivision 13 of section 314.

Is it " *plainly apparent* from the context " of this section that in this connection the Legislature intended that a different conception should be had of " personal property " from the general one which it has expressly enjoined? Quite the reverse is the case. Even standing alone, subdivisions 1 to 4 of section 40 give to Surrogates' Courts an express charter and mandate to do all things necessary to marshal and distribute a decedent's estate. The natural steps in this regard are, *first*, to appoint a fiduciary for the purpose; *second*, to gather together in the hands of such fiduciary all of the property and property rights of the decedent which do not pass directly to the beneficiaries named in his will or by operation of law; *third*, to pay funeral and administration expenses of the estate and the debts of the decedent; *fourth*, to determine the persons to whom the remainder of the estate is to pass; and *fifth*, to assure that such persons receive it. Power in respect to the first enumerated step is expressly given in subdivision 2; over the fourth, in subdivision 1; and over the others in subdivision 4. The comprehensive nature of the plan envisaged in the statutory enactment is entirely apparent, and comprises, in itself, by express grant, every step necessary to a complete disposition of all matters requisite to be done in the settlement of a decedent's temporal affairs. No different result is attainable on any reasonable basis of construction of the powers thus given in detail, but to make assurance doubly sure and to place the all-embracing jurisdiction of Surrogates' Courts over matters affecting decedents' estates upon such an absolutely unassailable basis that by no chance might it be questioned, the Legislature, in addition to granting express power to take each single essential step in settling a decedent's

estate, has given it power over all such matters in general, by the most sweeping grant of jurisdiction conceivable: " *To administer justice in all matters relating to the affairs of decedents*, and upon the return of any process to try and determine all questions, legal or equitable, arising between any or all parties to any proceeding, or between any party and any other person having any claim or interest therein who voluntarily appears in such proceeding, or is brought in by supplemental citation, *as to any and all matters necessary to be determined in order to make a full, equitable and complete disposition of the matter* by such order or decree as justice requires." (Italics not in original.)

The effect of this enactment as vesting in the Surrogate's Court jurisdiction of all matters pertaining to decedents' estates is self-evident, and it has been so declared by repeated adjudications of courts of controlling authority. As was said by Chief Judge CARDOZO, writing for the unanimous court in *Matter of Raymond* v. *Davis* (248 N. Y. 67, at p. 72): " ' Concentration of jurisdiction as to decedents' estates ' (per FOLEY, S., in *Matter of Haigh, supra*) is the purpose clearly revealed in the statutory scheme. ' The state has empowered surrogates in unmistakable language, and it is not the function of the courts to discover or to fashion reasons for thwarting the manifest policy.' (Per THOMAS, J., in *Matter of Coombs*, 185 App. Div. 312, 314.) To remit the claimant to another forum after all these advances and retreats, these reconnaissances, and skirmishes, would be a postponement of justice equivalent to a denial." In *Matter of Akin* (248 N. Y. 202, at p. 205) the same court says in part: " The express grant of power to the surrogate to hear and determine the issue raised by an answer which ' alleges title to or the right to possession of any property involved in the inquiry ' shows a legislative intent that the surrogate should have jurisdiction to determine title to the property *in spite* of an assertion of adverse claim of title in an answer. * * * If doubt as to the legislative intent had existed before, that amendment (Laws 1924, c. 100) makes clear that in a discovery proceeding the Surrogate's Court has now jurisdiction to dispose of every claim to property which should be delivered to an executor, administrator or guardian."

The Appellate Division of this department, in its opinion in *Matter of Coombs* (185 App. Div. 312), which is cited with approval by the Court of Appeals in *Matter of Raymond* v. *Davis (supra)*, said (at p. 314): " The language is so comprehensive that in association with section 2681 it sweeps away all constraints upon the surrogate's jurisdiction, and the necessity of multiplying remedies in the distribution and transfer of a decedent's property to whom-

soever it belongs or should be delivered. The policy of securing unity of administration of a decedent's estate should result in expedition and thrift, and demands varied and highly informed judicial capacities. The State has empowered surrogates in unmistakable language, and it is not the function of the courts to discover or to fashion reasons for thwarting the manifest policy."

The same court in *Matter of Seaman* (205 App. Div. 681) says (at p. 686), "under the present Surrogate's Court Act that official [the surrogate] has power to try all questions legal and equitable."

Similar determinations to like effect may be found in *Matter of Ashner* (231 App. Div. 127 [2d Dept.]); *Van Buren* v. *Estate of Decker* (204 id. 138 [3d Dept.]); *McLean* v. *Hart*, 228 id. 379 [3d Dept.]; *Matter of Buckler* (227 id. 146 [4th Dept.]; *Matter of Beach* (122 Misc. 261; affd., 208 App. Div. 831 [4th Dept.]).

Finally, in its sweeping decision in *Matter of Wilson* (252 N. Y. 155), the Court of Appeals, after reaffirming its adherence to its statement in *Matter of Akin* (*supra*), that "The Surrogate's Court has now jurisdiction to dispose of every claim to property which should be delivered to an executor, administrator or guardian," continues (at p. 158): "We are now called upon to determine whether such jurisdiction has been granted in case the specified property has been transferred and is no longer in the possession or control of the third person proceeded against.

"The clear wording of the amendment confers such authority upon the Surrogate's Court, and it may, when it appears that ' the estate property shall have been diverted or disposed of,' make a decree directing the payment of the proceeds or value of such property to the representative of the estate. The correctness of the conclusion reached as to the purpose of the amendment is made clear by a study of the historic development of the law upon the subject."

In *Matter of Morris* (134 Misc. 374) this court attempted such an historical review of probate jurisdiction from the time of the earliest Dutch settlements to the present, as a result of which it reached and (at p. 382) stated the following conclusion respecting the present jurisdiction of the Surrogate's Court: "It is believed that no reasonable construction of this statute could be made which did not hold that the Surrogates' Courts now possess entirely unlimited jurisdiction over any and every legal and equitable question which may ever arise in connection with decedents' estates and the relations of guardians and wards so far as it concerns any person actually or constructively before the court by reason of any right in, claim to, or obligation in connection with, a decedent's or ward's estate."

Nothing has since been called to its attention leading to a modification of the view thus expressed.

It must follow, therefore, both on reason and authority that it is not only not " plainly apparent from the context " of section 40 that the Legislature intended a definition of personal property to be there applied differing from that laid down in subdivision 13 of section 314, but that it is most obvious that such definition is especially applicable in that connection.

The question of jurisdiction, therefore, resolves itself simply into one of whether that which was delivered by the administrators to the Lawyers Trust Company in the case at bar, and which gave rise to the undisputed obligation of the latter, was personal property within the definition of the Legislature.

It is unquestionable that as between the trust company and the estate, the relationship of debtor and creditor was created. (*Matter of McCarthy*, 139 Misc. 147; *Matter of Kruger*, Id. 907; *Matter of Kruger*, 141 id. 475, and cases cited in these three opinions.) The precise medium by which this relationship had its inception is not disclosed, except that it appears that the transaction was an ordinary, commercial one. Obviously, therefore, it must have arisen in one of three ways, *first*, by the delivery of cash; *second*, by the delivery of securities which were subsequently sold; or *third*, by the indorsement and delivery of negotiable paper. In either event, the thing delivered was personal property of the estate within the legislative definition noted. Unquestionably, the obligation of the trust company to the estate is measurable by the " proceeds or value of [the] personal property belonging to " the estate thus delivered by the estate fiduciaries to the trust company. Is it within the power of the Surrogate's Court to enforce this liability? Were the identical cash or security or item of negotiable paper in the hands of the trust company, there is abundant authority even prior to the amendment to section 40, effected by chapter 100 of the Laws of 1924, for an affirmative determination. If, therefore, the addition to subdivision 4 so effected and reading, " To enforce against a respondent the delivery of personal property, * * * belonging to or withheld from an estate," be construed as carrying the powers of the court no further than the point at which they stood prior to such amendment, then indeed, the Legislature must be held to have done a vain and useless thing in its enactment. That no such construction is to be adopted is not only self-evident on basic principles of statutory construction, but is demonstrated on the highest possible authority by the interpretation placed by the Court of Appeals on the analogous addition to section 206 of the Surrogate's Court Act in *Matter of Wilson* (*supra*).

What the administrators here seek is the enforcement against respondent, Lawyers Trust Company, of its obligation for "the payment of the proceeds or value of personal property belonging to " this estate and which was intrusted to it, as trust property subject to the jurisdiction of this court, by the fiduciaries of the estate. To this end, the powers of the court are, by the express as well as the general terms of the statute, ample and complete.

The further argument of the trust company against the jurisdiction of the court, that it is entitled to a trial of the issues by a jury, is also wholly without merit. (Surr. Ct. Act, § 68; *Matter of Heinze*, 224 N. Y. 1, 6; *Matter of Wilson*, 252 id. 155, 159.)

The objection to the jurisdiction of the court is, therefore, overruled.

Whereas the question of the claim of the administrators against the trust company is inferentially raised by their account, it is not completely alleged in their petition. A supplemental petition should, therefore, be filed, which the respondent should answer on the merits. When this is done the matter may be set down for a hearing and determination on the merits.

The next question for consideration relates to the liability of Frances Stewart or her attorney in fact for the money, whether $2,000 or $5,000, which the administrators paid over to her on account of her supposed distributive share in the estate. Although duly cited, both have defaulted in appearance or answer. Under such circumstances it becomes the duty of the court to determine whether the facts set forth in the petition and account establish a *prima facie* obligation for repayment. The only statements pertinent in this connection are that, on or about April 27, 1926, and May 1, 1926, the administrators signed checks for specified sums, payable to Frances Stewart, " as payment on account of moneys due her from the estate," and that receipt on her account of the $5,000 check was admitted but denied as to the one for $2,000. These allegations of the petition are elaborated by Schedule " E " of the account which purports to enumerate " all moneys paid to legatees, widow, or next-of-kin of the deceased." Both from the allegations of the petition and the recitals in Schedule " E " it is apparent that the payment or payments to Frances Stewart were made on the mistaken belief that she was entitled to them as one of the next of kin of the decedent. In both places such mistake is characterized as a " mistake of fact," but as this is a conclusion of law it is not binding on any one. No allegation is made respecting any actions by or on behalf of the payee leading up to the payment. The question is, therefore, squarely presented as if by a demurrer as to whether a payment made and received

under such circumstances may be recovered. No authorities on this subject have been presented by any party to the proceeding. In view of the frequent recurrence of similar questions and the apparent confusion existing in the minds of many members of the bar in respect to the applicable governing principles, the court deems it to be of advantage to attempt to outline the state of the law on the subject.

Any general consideration of the subject of the right of a person to recover money paid to another has its natural genesis in the legal situation of a volunteer. As the term is used in this connection, " a volunteer " is " ' one who has paid the debts of another without request, when he was not legally or morally bound so to do and when he had no interest to protect in making such payment.' " (*McNamee* v. *Zimmett*, 207 App. Div. 60, 62; affd., 239 N. Y. 602.) Such an individual is permitted to suffer the usual legal fate of an intermeddler and is denied any rights whatsoever against any one, as a result of the transaction. (*McNamee* v. *Zimmett, supra;* see *Belloff* v. *Dime Savings Bank of Williamsburg*, 118 App. Div. 20; affd., 191 N. Y. 551; *Flynn* v. *Hurd*, 118 id. 19.) The usual characteristics of human nature naturally tend to make such a situation of rare occurrence. The *ratio decidendi* of such a case is, however, identical with that which underlies the extremely ancient and well-established common-law doctrine of the impossibility of recovery of any voluntary payment. This principle of law has been stated and applied on innumerable occasions beginning with the early case of *Hall* v. *Schultz* (4 Johns. 240), decided in 1809. A few typical statements partially indicating the extent and basis of the rule may be worthy of repetition.

In *Clarke* v. *Dutcher* (9 Cow. 674), decided in 1824, the following appears (at p. 681): " Although there are a few dicta of eminent judges to the contrary, I consider the current and weight of authorities as clearly establishing the position, that where money is paid with a full knowledge of all the facts and circumstances upon which it is demanded, or with the means of such knowledge, it cannot be recovered back."

The early Court of Appeals case of *N. Y. & Harlem R. R. Co.* v. *Marsh* (12 N. Y. 308) reaffirms the doctrine, the court saying (at p. 312), " the money has been voluntarily paid upon a claim of right by the party receiving it, and without any misrepresentation or concealment of fact, in relation to the claim by him, or any mistake of fact on the part of the company. Under such circumstances no action can be maintained to recover it back."

*Lowber* v. *Selden* (11 How. Pr. 526) contributes the following (at p. 527): " A voluntary payment, deliberately and under

standingly made, without fraud or duress, cannot be recovered back — and ought not to be — by action either at law or in equity."

Additional statements or applications of the rule may be found in *Wood* v. *Amory* (105 N. Y. 278, 282); *Mowatt* v. *Wright* (1 Wend. 355, 360); *Hayes* v. *Huffstater* (65 Barb. 530, 532); *Trust Company of America* v. *Hamilton Bank of N. Y.* (127 App. Div. 515, 517); *Payne* v. *Witherbee, Sherman & Co.* (200 N. Y. 572, 576) and in a host of other decisions in all the courts of this State.

The rule deducible from an analysis of these and other decisions is that when a person, uninfluenced by fraud or coercion, and possessed of a knowledge of all material facts, pays a sum of money to another, he cannot recover it from such other, even though the payment was actually without consideration (*Wyman* v. *Farnsworth*, 3 Barb. 369, 371) or was made under a void agreement (*Smith* v. *Ziegler*, 17 N. Y. Supp. 338, 340; reported by memorandum only, 63 Hun, 624).

In *Wyman* v. *Farnsworth* (3 Barb. 369, at p. 371) there is a dictum to the effect that the payer is bound, if he had the means of ascertaining the facts, although he was not actually cognizant of them. (See, also, *Clarke* v. *Dutcher*, 9 Cow. 674.) Whereas such may have been the strict common-law rule, it is unquestionable that this has not survived the application of equitable principles, as hereinafter noted.

It follows, from a parity of principle, that in the absence of fraud or duress, payments professedly made in compromise of existing rights cannot be recovered (*Mowatt* v. *Wright*, 1 Wend. 355, 360; *Wheadon* v. *Olds*, 20 id. 174, 176), and a like rule applies also to payments on an executory contract, where " the consideration for the payment is the agreement of the other party." (*Youmans* v. *Edgerton*, 16 Hun, 28, 32; affd., 91 N. Y. 403.)

Before leaving this branch of the subject, an exception to the general doctrine should be noted to the effect that it is inapplicable to governmental agencies (*Village of Fort Edward* v. *Fish*, 156 N. Y. 363, 374; *County of Erie* v. *Town of Tonawanda*, 95 Misc. 663, 666, 667; affd., 176 App. Div. 942), the theory of the exception, as stated in the former case at page 374, being as follows: " The statute forbade the payment from the funds of the water board, and action forbidden by statute is void. A void act is no act, and a void payment is no payment. Such a payment is not voluntarily made by the corporation, but by its agent, in excess of his authority and in defiance of its rights. It is not the act of the corporation itself, but of one, without authority, who assumed to act for it."

That this exception is to be sparingly applied and strictly confined to cases where a governmental agency is a party to the proceed-

ing is indicated by the result attained by the Court of Appeals in *Flynn* v. *Hurd* (118 N. Y. 19), in which the court denied similar relief to a commissioner of highways who, on behalf of his town, had erroneously paid a sum in excess of the proper *pro rata* contribution for the repair of a bridge.

In this, as in many other legal subjects, the acerbity of strict common-law rules was early ameliorated by the application of equitable principles, and, as far as variations from the basic rule that money once paid is gone forever are found in the cases, they must be attributed to this source. As is noted in *Youmans* v. *Edgerton* (16 Hun, 28, at p. 32; affd., 91 N. Y. 403), "an action to recover back money paid by mistake is a strictly equitable action, based on the idea that the defendant ought not to retain that for which he has given nothing."

If this basic principle of equitable interposition is borne in mind, much of the confusion which exists on the subject will vanish, and it will be found that relief is granted only where and to the extent that absolute fairness to both parties makes such course permissible.

The instances in which a payment will usually fail to represent the considered voluntary act of the party making it, naturally group themselves under three heads:

*First*, where it is the result of a mistaken belief on the part of one or both parties to the transaction;

*Second*, where it was induced by unfair conduct on the part of the one to whom it was made; and

*Third*, where the volition of the payer was overcome by some act of the payee.

Since a payment once made *prima facie* terminates the transaction, the burden of proof, on usual principles, is cast on the person seeking a recovery thereof, to demonstrate the existence of facts or conditions warranting the active interposition of equity to compel its refund. As was said in *Wyman* v. *Farnsworth* (3 Barb. 369, at p. 371): "The onus is on the party claiming a return of money paid under a misapprehension, to show the facts entitling him to it."

Other countervailing equitable considerations being for the moment laid aside, it is inequitable for a person to retain a benefit for which he has given no consideration, where it was conferred by one laboring under a misconception of existing facts. In reality this is merely another phase of the interposition of equity to prevent unjust enrichment. Obviously, whether such a condition existed in a given case, is a pure question of fact to be determined in the usual manner. (*Kingston Bank* v. *Eltinge*, 40 N. Y. 391, 396.)

The "mistake of fact" which may give rise to a right of recovery is defined in *Mowatt* v. *Wright* (1 Wend. 355, 360) as existing "either when some fact which really exists is unknown, or some fact is supposed to exist, which really does not exist." This definition is quoted with approval and followed by the Court of Appeals in *Rheel* v. *Hicks* (25 N. Y. 289, at p. 291).

Naturally, the commonest example of mistake is where both parties act on an erroneous belief as to pertinent facts. Here the law is uniform that the courts, subject to countervailing equitable considerations, will intervene to compel the return of money paid as a result of such misapprehension as to facts. (*Mowatt* v. *Wright*, 1 Wend. 355, 360; *Woodruff* v. *Claflin Co.*, 198 N. Y. 470, 473; *Mayor, etc., of City of N. Y.* v. *Erben*, 38 id. 305, 310; *Rheel* v. *Hicks*, 25 id. 289, 291; *Lake* v. *Artisans Bank*, 3 Abb. Dec. 10, 15; *Freeman* v. *Ralph Realty Corp.*, 198 App. Div. 788, 791.) That the rule is not, however, limited to cases of such mutual mistake, as indeed it should not be, if general equitable principles are applicable, is demonstrated by the decisions in many adjudications. Obviously, on equitable principles, relief will be granted where the party making the payment mistook material facts and the other was guilty of inequitable conduct (*Woodruff* v. *Claflin Co.*, 198 N. Y. 470, 473), but it has also been determined that a pure unilateral mistake on the part of the payer furnishes an adequate basis on which to found relief (*Hathaway* v. *County of Delaware*, 185 N. Y. 368, 370), even though the payer may have been negligent in their ascertainment. (*Ball* v. *Shepard*, 202 N. Y. 247, 253; *Hathaway* v. *County of Delaware*, 185 id. 368; *Kingston Bank* v. *Eltinge*, 40 id. 391, 396.) Since relief when granted in such cases is based on a demonstration that the payment was made in reliance upon a mistaken understanding of the facts, it follows that relief will not be granted on this score except where it appears that the fact, erroneously believed to exist, was material, and that a correct knowledge of the actual facts would have induced a different action on the part of the payer. (*Kessler* v. *Herklotz*, 190 N. Y. 24, 27; *Flower* v. *Lance*, 59 id. 603, 610.)

In view of the equitable nature of the relief invoked in such an application, it is obvious that even though a *prima facie* demonstration for repayment be made, equity will not act where to do so would involve a violation of ordinary equitable principles. (*Ball* v. *Shepard*, 202 N. Y. 247, 254; *Hathaway* v. *County of Delaware*, 185 id. 368, 370; *Haviland* v. *Willets*, 141 id. 35, 51.) Thus, relief will not be granted where the payer has been guilty of laches or there is an estoppel against him (*Woodruff* v. *Claflin Co.*, 198 N. Y. 470, 474, 479; *Haviland* v. *Willets*, 141 id. 35, 51, *Burne*

v. *Van Raalte Co., Inc.*, 202 App. Div. 189, 194; *Wood* v. *Amory*, 105 N. Y. 278, 283), or the circumstances of an innocent payee have been so changed by reason of the payment that a judgment directing return would cause undue hardship. (*Ball* v. *Shepard*, 202 N. Y. 247, 253, 256; *Hathaway* v. *County of Delaware*, 185 id. 368, 370; *Haviland* v. *Willets*, 141 id. 35, 51, 52.) If a *prima facie* case for repayment has been made out, the burden of showing the counter equities, rendering relief inequitable, passes to the party resisting the payment. (*Ball* v. *Shepard*, 202 N. Y. 247, 253; *Hathaway* v. *County of Delaware*, 185 id. 368, 370.)

The sole exception to the rules considered in this connection is illustrated by the facts and determination of the Court of Appeals in *Ball* v. *Shepard* (202 N. Y. 247). In that case one " V." represented that one of his reliable customers had placed an order with him for the purchase of certain bonds, and that he had bought them of defendants. It was the custom of " V." and plaintiffs for the latter temporarily to finance such transactions for " V.," and the latter requested plaintiffs to pay defendants for these bonds when tendered for delivery. This plaintiffs did. They later learned that " V.'s " statements were false, and thereupon tendered the bonds to defendants and demanded a return of the purchase price. On the refusal of the latter, an action was brought to recover such purchase price on the ground of payment based on mistake. The court, in denying recovery, said (at p. 253), " the mistake which is relied upon as the basis for recovery must arise in the transaction between the parties to the action."

It further states in substance (at p. 256) that there can be no recovery where " the mistake of the payor is usually superinduced by the fraud of a third person and the payee is not only ignorant of the fraud or mistake, but receives the money in good faith in the regular course of business and for a valuable consideration."

Where no mistake of fact exists, but the payment has been made solely by reason of a misapprehension of the applicable law, an additional element is injected into the determination, in the familiar principle that " Every man is to be charged at his peril with a knowledge of the law. There is no other principle which is safe and practicable in the common business of mankind." (*Doll* v. *Earle*, 65 Barb. 298, 300; affd., 59 N. Y. 638.)

Where, therefore, no mistake of fact exists and no fraud· or coercion has been practiced, there is nothing upon which a court of equity can base a judgment for relief. In all such cases it has consequently been held that payments cannot be recovered. (*Clarke* v. *Dutcher*, 9 Cow. 674, 680, where the question related to a tenant's obligation to his landlord; *Mowatt* v. *Wright*, 1 Wend. 355, 360,

which concerned the dower rights of a widow; *Doll* v. *Earle*, 65 Barb. 298, 300, 302; affd., 59 N. Y. 638, where a payment was made in reliance upon a decision of the United States Supreme Court, which was subsequently overruled by the same court; *Flower* v. *Lance*, 59 N. Y. 603, 610, involving the same considerations as the last cited case; *Wood* v. *Amory*, 105 N. Y. 278, 282, 283, where the mistake alleged was an erroneous computation by a referee; *Flynn* v. *Hurd*, 118 N. Y. 19, 26, where the question was the statutory liability of three towns to pay for bridge repairs; *Haviland* v. *Willets*, 141 N. Y. 35, 50, involving intestate distribution; *Newburgh Sav. Bank* v. *Town of Woodbury*, 173 N. Y. 55, 60, 61, in which money was advanced under a statute subsequently declared unconstitutional; *Belloff* v. *Dime Savings Bank of Williamsburgh*, 118 App. Div. 20, 21, 22; affd., 191 N. Y. 551, where the question related to the validity of a title to real estate; *Knickerbocker Trust Co.* v. *Oneonta, C. & R. S. Ry. Co.*, 138 App. Div. 687, 694; affd., 201 N. Y. 379, where money was advanced on the faith of an order of court which was subsequently reversed; *Gillig* v. *Grant*, 23 App. Div. 596, 599, in which the question was presented as to the relative rights of creditors under successive attachments.)

As was said in *Mowatt* v. *Wright* (*supra*, at p. 360), "when a person is truly acquainted with the existence or non-existence of the facts, but is ignorant of the legal consequences, he is under an error of law."

To this rule of denial of relief in cases of pure mistake of law, there is one real and one apparent exception. The former, illustrated by *Gillig* v. *Grant* (23 App. Div. 596, 600), is that " money paid under a mistake of law to an officer of the court can be recovered." (See, also, *Matter of Voluntary Dissolution of the Home Provident Safety Fund Association*, 129 N. Y. 288, 300.)

The latter relates to mistakes respecting foreign law. Consonant with the principle that foreign law is merely a question of fact (*Matter of Smith*, 136 Misc. 863, 877, 878, and cases cited), it has been held that the mistake of a payer in respect to the law of a jurisdiction other than his own, is a mistake of fact and is to be dealt with accordingly. (*Doll* v. *Earle*, 65 Barb. 298, 302; affd., 59 N. Y. 638; *Bank of Chillicothe* v. *Dodge*, 8 Barb. 233, 237.)

Since equity, all else being equal, will interpose to grant relief on principles of basic justice in cases where the payer alone labored under a mistake of fact to which the payee did not contribute, it is obvious, as an *a fortiori* matter, that it will interpose even more readily where the payment was induced by fraud, misrepresentation or other inequitable conduct on the part of the person receiving

the payment. (*Mowatt* v. *Wright*, 1 Wend. 355, 360; *Belloff* v' *Dime Savings Bank of Williamsburgh*, 118 App. Div. 20, 22; affd., 191 N. Y. 551; *Haviland* v. *Willets*, 141 id. 35, 50.)

The final basis for recovery, namely, where the action of the payee is such as to deprive the payer of unrestrained volition, rests on equitable grounds similar to those of fraud or misrepresentation. In this respect, however, the line is finely drawn, and if actual legal compulsion is not clearly demonstrated, the payment will be deemed voluntary with the usual consequence of a denial of relief. Actual duress of person, of course, presents a clear case for recovery. (*Flower* v. *Lance*, 59 N. Y. 603, 610; *Vaughn* v. *Village of Port Chester*, 135 id. 460, 463.) The same applies to duress of goods, where the payee is in possession of property of the payer, which he refuses to surrender unless the payment is made. (*Boss* v. *Hutchinson*, 182 App. Div. 88; *Briggs* v. *Boyd*, 56 N. Y. 289, 293; *Clancy* v. *Dutton*, 129 App. Div. 23, 25; *Consolidated Fruit Jar Co.* v. *Wisner*, 110 id. 99, 102; affd., 188 N. Y. 624; *Reed* v. *Hayward*, 82 App. Div. 416, 418.)

While a payment actually made under compulsion is involuntary and may be recovered, the reality of such compulsion must be clearly demonstrated.

" A payment is deemed in law to be compulsory when the party making it cannot legally resist it." (*Blanchard* v. *Blanchard*, 201 N. Y. 134, 138.) This thought is developed in *Boss* v. *Hutchinson* (182 App. Div. 88, at p. 90): " The general rule is that where an unfounded or illegal demand is made upon a person and the law furnishes him adequate protection against it or gives him an adequate remedy, instead of taking the protection the law gives him or the remedy it furnishes, he pays what is demanded, such payment is deemed to be a voluntary one."

As is said in *Kamenitsky* v. *Corcoran* (177 App. Div. 605, 608), " the immediate necessity, or a reasonable belief in the immediate necessity, for making the payment, to avoid consequences for which no other means of relief are available, must be shown."

In accordance with these principles, payments have been held involuntary where proceedings for sale under an assessment had been instituted (*Vaughan* v. *Village of Port Chester*, 135 N. Y. 460, 464) and where a court order directing a payment had been made (*Matter of Voluntary Dissolution of Home Provident Safety Fund Association*, 129 N. Y. 288, 300), but payments on a mere assessment (*People* v. *Wilmerding*, 136 N. Y. 363, 374), on the filing of a *lis pendens*, which precluded the placing of a loan (*Neufeld* v. *City of N. Y.*, 93 App. Div. 591, 592), of an advance over contract price in order to obtain a delivery of goods (*Boss* v. *Hutchinson*,

182 App. Div. 88, 90), or to the owner of premises in front of which a licensed news stand was conducted (*Kamenitsky* v. *Corcoran*, 177 App. Div. 605, 608), have been held not made under compulsion and in such a manner to warrant recovery.

Popular impression to the contrary notwithstanding, it appears to be authoritatively settled that the making of, or failure to make, protest at the time a payment is made, will in no wise vary the basic rights of recovery, hereinbefore reviewed. (*Kienle* v. *Gretsch Realty Co.*, 133 App. Div. 391; *People* v. *Wilmerding*, 136 N. Y. 363; *Flower* v. *Lance*, 59 id. 603, 609; *Boss* v. *Hutchinson*, 182 App. Div. 88, 90; *Vaughan* v. *Village of Port Chester*, 135 N. Y. 460.)

By the way of summary, therefore, it is established that

1. Money paid by a party cannot be recovered by him:

A. Where it was paid without legal or moral obligation in solution of the debt of another.

B. Where it was paid other than to a governmental agency with full knowledge of all material facts and without fraud, coercion or other inequitable conduct on the part of the payee.

C. Where it was made solely on a mistake of domestic law, other than to an officer of the court.

2. Money paid may be recovered:

A. Where it was paid under a material mistake of fact or foreign law on the part of the payer, in a transaction between the parties.

B. Where it was paid and recovery is sought by a governmental agency.

C. Where it was paid to an officer of the court.

D. Where it was paid as a result of fraud or other inequitable conduct on the part of the payee.

E. Where it was paid as a result of duress of person or goods or where the payment was not capable of legal resistance.

3. An action for repayment is subject to equitable principles and to like defenses.

Applying these principles to the payment by the administrators to Frances Stewart in the case at bar, it is obvious that the only pertinent facts involved were that she was an adopted daughter of decedent's deceased brother and that the size and condition of the estate were such that if she was entitled to an equal distributive share this would at least equal $7,000. Both of these facts were true. The question of whether, possessing the indicated relationship to the decedent, she was entitled to such equal distributive share was a pure question of law. To paraphrase the language of *Mowatt* v. *Wright* (*supra*), the legal consequences of her relationship, of which the administrators were ignorant, were that she was entitled to nothing. They were, therefore, laboring

under a pure error of law in making the payment, and for this no recovery can be had.

The relief against Frances Stewart and her attorney in fact must, therefore, be denied.

The responsibility, if any, of the National Surety Company cannot be determined in the absence of a hearing. The petition, in effect, charges that the diversion of the funds of the estate was the result of the acts of the resident vice-president of the company. This is denied by the company. Whether any acts of the company or its accredited representatives were such as to impose such liability is an issue of fact as well as of law, and the facts must be established before the law can be applied.

The several parties will, therefore, proceed to bring on for hearing the questions respecting the liability of Lawyers Trust Company and National Surety Company. Thereafter, the obligations of the administrators can be fixed.

Proceed accordingly.