CHARLES E. BALL et al., Composing the Firm of BALL & WHICHER, Respondents, *v.* EDWARD D. SHEPARD et al., Composing the Firm of E. D. SHEPARD & COMPANY, Appellants.

Money had and received — action to recover money claimed to have been paid to defendants under a mistake of fact.

1. When one pays money to another upon the erroneous assumption that he is indebted to him, an action may be maintained for its recovery since the person receiving the money is not entitled to retain what he acquired by the mistake of the person making the payment even though the mistake is the result of negligence; but the mistake which is relied upon as the basis of recovery must arise in the transaction between the parties to the action; and even in such a case there can be no recovery if by reason of the payment the party receiving it had so changed his position to his prejudice that it would be unjust to require him to refund.

2. When, however, through the fraud of a third person, money is paid by one party who labors under a mistake of fact to another party who does not share in the mistake and who receives the money in good faith and in the regular course of business, and for a valuable consideration, it cannot be pursued into his hands by the one from whom it was obtained.

3. Plaintiffs, a firm of brokers dealing in stocks and bonds, employed one "V," a so-called "customers' man," who was also engaged in dealing in bonds and securities on his own account, plaintiffs at times advancing moneys with which to facilitate the transaction. On the occasion in question he informed plaintiffs that he had put through a $25,000 bond deal. Later defendants, also brokers, sent to plaintiffs twenty-five bonds. V. stated that he had a customer for them who was responsible, and who would send a certified check for them in an hour. Thereupon plaintiffs gave the messenger their check payable to defendants and received the bonds. When it appeared subsequently that V. had not sold the bonds plaintiffs tendered them back to defendants, claiming that they had paid for them under a mistake of fact, and demanded the return of the purchase price, which was refused by the defendants. Upon the trial of the action, brought by plaintiffs to recover the money from the defendants, the latter proved that V. came to their office and offered a certain price for the bonds in

question, which defendants accepted. At V.'s request they were billed to the plaintiffs at an advanced price, and sent to them by a messenger, who was instructed to get the plaintiffs' check for the bonds and have it certified. Upon the receipt of this check defendants gave their check to V. for his profits, the difference between the price at which he had bought the bonds and that at which they were billed to plaintiffs. It does not appear that defendants knew anything about the representations made by V. to plaintiffs as to his sale of the bonds. *Held,* that the plaintiffs were misled by the false statements of V., and not by anything that was said or done by the defendants, and, hence, cannot maintain the action.

*Ball* v. *Shepard,* 135 App. Div. 612, reversed.

(Argued May 5, 1911; decided May 30, 1911.)

APPEAL from a judgment of the Appellate Division of the Supreme Court in the first judicial department, entered January 5, 1910, affirming a judgment in favor of plaintiffs entered upon a verdict.

The nature of the action and the facts, so far as material, are stated in the opinion.

*L. Laflin Kellogg* and *Alfred C. Pettè* for appellants. The court erred in denying the defendants' motion to dismiss because by the uncontradicted evidence it appears that the defendants received the money sought to be recovered back in the regular course of an ordinary business transaction for a valuable consideration and without knowledge of the mistake of fact claimed by the plaintiffs and without fraud or collusion of any kind on their part. (*Justh* v. *Nat. Bank of Commonwealth,* 56 N. Y. 478; *Stevens* v. *Board of Education,* 79 N. Y. 183; *Southwick* v. *First Nat. Bank of Memphis,* 84 N. Y. 420; *Goshen Nat. Bank* v. *State of New York,* 141 N. Y. 379; *Hatch* v. *Nat. Bank,* 147 N. Y. 184; *Nassau Bank* v. *Nat. Bank of Newburgh,* 159 N. Y. 456; *Oldfield* v. *Vassar College,* 68 App. Div. 272; *Kessler* v. *Herklotz,* 190 N. Y. 24.) The trial court erred in its charge and refusals to charge the jury to the prejudice of the defendants. (*Justh* v. *Nat. Bank of Commonwealth,* 56 N. Y.

478; *Stevens* v. *Board of Education,* 79 N. Y. 183; *Southwick* v. *First Nat. Bank of Memphis,* 84 N. Y. 420; *Goshen Nat. Bank* v. *State of New York,* 141 N. Y. 379; *Patch* v. *Nat. Bank,* 147 N. Y. 184; *Nassau Bank* v. *Nat. Bank of Newburgh,* 159 N. Y. 456; *Oldfield* v. *Vassar College,* 68 App. Div. 272; *Kessler* v. *Herklotz,* 190 N. Y. 24.)

*Herman Aaron* for respondents. The doctrine of mutual mistake applies only to rescission of contracts and not to recovery back of payments made. In actions of the latter class mistakes need be only by the plaintiff. (*Sharkey* v. *Mansfield,* 90 N. Y. 227.) The doctrine that moneys received in the regular course of business cannot be recovered back is in no respect inconsistent with the doctrine of the recovery back of money paid by mistake, but refers to the pursuit of such money into the hands of a third party. (*Lawrence* v. *A. Nat. Bank,* 54 N. Y. 432; *Bank of Orleans* v. *Smith,* 3 Hill, 560.)

WERNER, J. The plaintiffs and defendants, respectively, are firms of brokers, each doing business in the city of New York under the form of a limited partnership. The action is brought to recover the sum of $24,906.25, which the plaintiffs claim to have paid to the defendants under a mistake of fact. The amended complaint, which rather vaguely presents the transaction in which this payment was made, alleges that in the course of the plaintiffs' business with the defendants and others, the plaintiffs frequently receive at their office various stocks and bonds which have been purchased or ordered by parties for whom the plaintiffs " clear," and upon the delivery thereof the plaintiffs pay for the same; that transactions of a similar character were of frequent occurrence between the plaintiffs and the defendants, and that this course of business was well known to the defendants; that on July 28th, 1908, the defendants sent to the plaintiffs, in

the regular course of business thus described, 25 bonds of the Yankee Fuel Company, each of the face value of $1,000, and requested as payment therefor the sum of $24,906.25; that in the belief that these bonds had been bought by one Spingarn and that he had arranged to remit to the plaintiffs the purchase price thereof, and relying upon a representation to that effect, the plaintiffs received the bonds and gave the defendants their check for the purchase price; that in fact Spingarn had not bought the bonds and had not arranged to remit the purchase price thereof as the plaintiffs had erroneously believed; that the plaintiffs having thus made payment to the defendants under a mistake of fact, tendered back the bonds and demanded a return of the purchase price, and that the defendants refused to comply with the demand.

The transaction, as disclosed by the evidence, is characterized by several features which are not mentioned in the complaint. From the testimony introduced by the plaintiffs it appears that one Valentine was employed by them as a "customers man" at a regular salary; that Valentine was also engaged on his own account in the sale of bonds and unlisted securities; that in these transactions he sometimes "cleared" through the plaintiffs and again through others. On the morning of July 28th, 1908, Valentine informed one of the plaintiffs that he had put through a $25,000 bond deal. An hour later the cashier of the plaintiffs reported that the defendants had sent over 25 bonds, and the cashier asked Mr. Chinn, one of the plaintiffs, if he was to give the messenger a check. Mr. Chinn asked the cashier if he had received a check "from the other end," and the cashier replied in the negative. Thereupon the cashier was instructed to hold the matter until Mr. Chinn could see Valentine about it. When Valentine came in Mr. Chinn said to him, "There are 25 Yankee Fuel bonds over here from Shepard and Company, where is your money from the other end?" Valentine replied, "Why that is all right, Mr. Chinn, I

have sold those bonds to a Mr. Spingarn of Spingarn Brothers; he is an uptown milliner, he owns the building he is in; I have sold him over $200,000 bonds in the past two or three years; in fact I have sold him $280,000 to be accurate; there is no use holding Shepard up for the payment of these bonds because a certified check will be down here in an hour from Mr. Spingarn." Upon these representations made by Valentine the plaintiffs' cashier was directed to draw the check of the plaintiffs payable to the order of the defendants. The check was signed by Mr. Chinn and delivered to the defendants' messenger who then gave up the bonds. When it subsequently transpired that Valentine had not sold the bonds to Spingarn, or at least that Spingarn disclaimed any transactions with Valentine, plaintiffs tendered back the bonds to the defendants and demanded a return of their check with the result already stated.

The foregoing is a fair synopsis of the case as it stood when the plaintiffs rested and the defendants moved for a dismissal of the complaint. When this motion had been denied the defendants presented to the court the other side of the transaction which, as may be surmised, relates wholly to the dealings between the defendants and Valentine.

From the testimony given on the part of the defendants it appears that on the morning of July 28th, 1908, Valentine went to the office of the defendants and made an offer of 90 flat, without stock, for 25 Yankee Fuel bonds. The employee to whom this offer was made communicated it to the cashier, who called up a Mr. Lincoln in the Philadelphia office and received word that the deal might be put through on that basis. At Valentine's request the defendants' cashier was instructed to bill the bonds to the plaintiffs at 98 and interest. The bonds were sent to the plaintiffs by a messenger with instructions to get a check on delivery, and to have it certified at once. Within an hour after the bonds had been delivered to the

plaintiffs, and their certified check had been given to the defendants, Valentine again went to the office of the defendants and there received a check for his profit in the transaction, which represented the difference between 90, at which he had bought, and 98, at which he had presumably sold. It did not appear that the defendants knew anything about Spingarn, or that they had any reason to suspect that Valentine had made any representations to the plaintiffs, false or otherwise. Neither was it shown that the defendants had any knowledge that the plaintiffs had given their check in the mistaken belief that the bonds had been sold to Spingarn.

Having thus briefly stated what the record discloses it may be useful to recapitulate a few of the salient facts for the purpose of classifying the transaction. The defendants had bonds to sell. Valentine desired to purchase. A price was agreed upon. At Valentine's request the bonds were billed to the plaintiffs who had agreed to " clear " for him, that being the technical term used in cases where one person sells to another and a third party temporarily advances the money with which to facilitate the transaction. The bonds were delivered to the plaintiffs, who gave their check in payment. By way of punctuation it may be pertinent at this point to observe that if there were no other facts to characterize the transaction, this would clearly have constituted a binding purchase by Valentine and a valid sale by the defendants. But we must assume that Valentine had falsely represented to plaintiffs that he had sold the bonds to Spingarn, whose check would be forthcoming, and that the plaintiffs believed that to be the fact when they gave their check to the defendants. Thus it is clear that as between Valentine and the plaintiffs there was fraud on the part of the former and mistake on the part of the latter. Upon proof of this fraud and mistake it is obvious that the plaintiffs would have had a good cause of action against Valentine; but we are at a loss to understand upon what

theory the plaintiffs can hold their recovery against the defendants. It is urged that the plaintiffs paid for the bonds under a mistake of fact and, therefore, are entitled to follow the purchase price into the hands of those who received it. This claim is predicated upon the principle that a party who pays money under a mistake of fact, to one who is not entitled thereto, must in equity and good conscience be permitted to get it back. That is a well-recognized principle of law, but we think it has no application to the case at bar. The simplest statement of the rule invoked by the plaintiffs is that if A pays money to B upon the erroneous assumption of the former that he is indebted to the latter, an action may be maintained for its recovery. The reason for the rule is obvious. Since A was mistaken in the assumption that he was indebted to B, the latter is not entitled to retain the money acquired by the mistake of the former, even though the mistake is the result of negligence. That is the general rule laid down in *Kingston Bank* v. *Eltinge* (40 N. Y. 391); *Union Nat. Bank of Troy* v. *Sixth Nat. Bank of New York* (43 N. Y. 452); *National Bank of Commerce* v. *National Mechanics' Banking Assn.* (55 N. Y. 211); *Lawrence* v. *American Nat. Bank* (54 N. Y. 432), and *Sharkey* v. *Mansfield* (90 N. Y. 227), which are relied upon by the plaintiffs. The difference between the case at bar and those relied upon by the plaintiffs is concretely illustrated in *Lawrence* v. *American Nat. Bank (supra)*. There the plaintiffs, being indebted to P. on account, made out a statement of the account and paid to the defendant, the assignee of P., the amount which appeared to be due. It transpired that the plaintiffs had made a mistake in omitting to charge the defendant with $5,000 which they had loaned to P. and for which they were entitled to credit. Here it will be well to note that the reason of the rule which was applied in the *Lawrence* case must, of necessity, carry with it at least two limitations. One is that the mistake which is relied upon

as the basis of recovery must arise in the transaction between the parties to the action; and the other is that even in such a case there can be no recovery if by reason of the payment the party receiving it has so changed his position to his prejudice that it would be unjust to require him to refund. (*Nat. Bank of Commerce* v. *Nat. Mechanics' Banking Assn.*, 55 N. Y. 211, 213 and *Hathaway* v. *County of Delaware*, 185 N. Y. 368, 370.) If circumstances do exist taking such a case out of the general rule permitting a recovery, the burden of proving them rests upon the party resisting the re-payment. (*Mayer* v. *Mayor, etc., of N. Y.*, 63 N. Y. 455.)

From what has been said it is evident that the rule which we have been discussing must have its antithesis, and we find it in that class of cases in which money is paid by one party, who labors under a mistake of fact, to another party who does not share in the mistake, and who receives the money in good faith in the regular course of business and for a valuable consideration. (*Justh* v. *Nat. Bank of Commonwealth*, 56 N. Y. 478; *Stephens* v. *Board of Education*, 79 N. Y. 183; *Southwick* v. *First Nat. Bank of Memphis*, 84 N. Y. 420; *Hatch* v. *Fourth National Bank*, 147 N. Y. 184; *Goshen Nat. Bank* v. *State of New York*, 141 N. Y. 379.) That rule has been tersely and correctly stated by Judge GRAY in *Nassau Bank* v. *Nat. Bank of Newburgh* (159 N. Y. 456) as follows: " When money has been received by a person in good faith, in the usual course of business and for a valuable consideration, it cannot be pursued into his hands by one from whom it has been obtained through the fraud of a third person." (p. 459.) And the reason for this latter rule has been well stated by Judge ANDREWS in *Stephens* v. *Bd. of Education* (*supra*) where he said: " It is absolutely necessary for practical business transactions that the payee of money in due course of business shall not be put upon inquiry at his peril as to the title of the payor. Money has no ear-mark. The purchaser of a

chattel or a chose in action may, by inquiry, in most cases, ascertain the right of the person from whom he takes the title.    But it is generally impracticable to trace the source from which the possessor of the money has derived it. It would introduce great confusion into commercial dealings if the creditor who receives money in payment of a debt is subject to the risk of accounting therefor to a third person who may be able to show that the debtor obtained it from him by felony or fraud.    The law wisely, from considerations of public policy and convenience, and to give security and certainty to business transactions, adjudges that the possession of money vests the title in the holder as to third persons dealing with him and receiving it in due course of business and in good faith upon a valid consideration."    (p. 187.)    Perhaps the simplest illustration of this principle is to be found in *Justh* v. *Nat. Bank of Commonwealth*, (*supra*), where the plaintiffs certified checks which had been obtained by fraud, were deposited with the defendant bank by the person committing the fraud, in the ordinary course of business, and were paid by the bank on presentation.    In that case the court suggested that the plaintiffs were cheated, not by the defendant, but by the fraud of the parties to whom they gave their certified checks, and that the loss occasioned by that fraud could not be transferred to the defendant bank, which was an entirely innocent party.    The checks there used were referred to by the court as money which came into the hands of the defendant "in the regular course of business, in a form as current as if it had been bank notes or United States currency," and the court concluded that if, in such a case, it could be followed because the party who paid it procured it fraudulently, "the transaction of business must stop, for no inquiry and no precaution could guard the receiver from responsibility."    In the nature of things there are exceptions to this rule, as, for instance, in a case where an agent is intrusted with property which

is disposed of by him in fraud of his principal, and where the property or its proceeds may be followed as far as either can be traced (*Van Alen* v. *Am. Nat. Bank,* 52 N. Y. 1, 8), but these are not germane to the present discussion, and they are mentioned only to obviate the possible misapprehension that we regard the rule by which the case at bar is controlled as one subject to no exception. Thus it will be seen that the two classes of cases above referred to are divided by a line which is very narrow and yet well defined. In the first class, relied upon by the plaintiffs, the mistake of fact is usually one which arises *inter partes,* and in order to justify a recovery in any such case it must appear that the defendant was not, in the first instance, entitled to receive the money; and that his circumstances have not been so changed through its receipt as to render it unjust to compel him to refund. In the second class the mistake of the payor is usually superinduced by the fraud of a third person and the payee is not only ignorant of the fraud or mistake, but receives the money in good faith in the regular course of business and for a valuable consideration. The mere statement of this rule seems at once to demonstrate the *status* of the case at bar. Here the defendants had agreed to sell the bonds to Valentine. The latter directed the former to send the securities to the plaintiffs who would pay for them. Valentine bought the bonds and the plaintiffs advanced to him the purchase price which he was required to pay to the defendants. Let us suppose that Valentine's statement to the plaintiffs had been true and that Spingarn had in fact agreed to buy the bonds from Valentine, but had defaulted in his obligation to do so. In these circumstances the plaintiffs would surely have been confined to a recovery against Valentine. How is the situation changed because Valentine's statement was false? The plaintiffs were misled by this statement and not by anything that was said or done by the defendants. That was the precise situation in

*Stephens* v. *Board of Education* (*supra*) where the plaintiff took from a defaulting member of the defendant board of education a forged mortgage, the proceeds of which were received by the defendant in payment of the defaulter's debt to it, and disbursed by them in the regular course of business. The fact that in the case at bar the payment by the plaintiffs to the defendants was made by check is of no significance except as it might have enabled the plaintiffs, had they seasonably discovered their mistake, to stop payment on the check. Once the check was paid, however, it was the same as though money had been paid in the first instance. In this respect the case at bar does not differ from *Southwick* v. *First Nat. Bank of Memphis* (*supra*), in which the bank had innocently and in the regular course of business paid a draft in respect of which there had been fraud by the drawer and mistake by the drawee. The case of *Hathaway* v. *County of Delaware* (*supra*), upon which both of the counsel in the case at bar seem to rely to some extent, is one which presents some features common to the class which follow the *Justh* case, but also some special circumstances which warranted a recovery. In that case, as in the case at bar, the payment was made by check which was drawn to the order of the defendant. In both cases, therefore, the defendants were chargeable with notice of the fact that it was the money of the plaintiffs which was being paid to liquidate the debt of a third person. But at this point there is an end of the parallel between the two cases. In the *Hathaway* case the check was made payable to the county of Delaware upon the faith of a note purporting to be the obligation of the county but being in fact a forgery. The check was diverted from the only purpose for which it could lawfully have been made, and was used to pay the debt of a defaulting treasurer to the county, a purpose for which neither of the parties to the action had ever intended to give it currency. These facts, supplemented

by the circumstance that the defendant's position had not been changed to its prejudice, were the controlling factors in the decision which upheld the recovery in that case. In the case at bar the check was applied to the identical purpose for which it was made. The plaintiffs knew that it was to go to the defendants in payment for bonds which Valentine had bought. Defendants delivered up the bonds and obtained the money on the check. There was no mistake in the transaction as between the plaintiffs and the defendants, and the only mistake disclosed by the record is that the plaintiffs confided in a faithless employee and associate.

In this view of the controversy it is apparent that there was no issue to submit to the jury, and that the one submitted was not in the case. The transaction between the parties could have given rise to but one legal issue, and that was whether the defendants were parties to the fraud of Valentine or the mistake of the plaintiffs. No such issue was either pleaded or proven. The complaint should, therefore, have been dismissed. The issue submitted to the jury was whether the plaintiffs had purchased the bonds from the defendants, and that question was not in the case, for nothing of that kind is claimed by either party. And even upon that question, assuming it to be in the case, the learned trial court fell into error both in charging as requested by counsel for the plaintiffs and refusing to charge as requested by counsel for the defendants. The court charged, in substance, that if the plaintiffs were mere clearance agents for Valentine, and had not bought the bonds from the defendants, but had paid for them under the mistaken belief that they had been bought by Spingarn, and if the position of the defendants had not been changed by the transaction, the plaintiffs were entitled to recover. The court also declined to charge that if the jury should find that the check in question was paid in the usual course of business, for a valuable consideration to the defendants without fraud or

collusion on the part of the defendants relative to the transaction, the verdict of the jury must be for the defendants.  Both of these rulings were erroneous within the principles by which we think this case is controlled.

The judgment should be reversed and a new trial granted, with costs to abide the event.

CULLEN, Ch. J., GRAY, HAIGHT, VANN, WILLARD BARTLETT and CHASE, JJ., concur.

Judgment reversed, etc.