**ARLINGTON PARK RACETRACK LTD. and Tele–Conference Corporation, Plaintiffs,**

v.

**SRM COMPUTERS, INC., Joseph L. Schwartz, and RCA American Communications, Inc., Defendants.**

No. 86 CV 2543 (ERK).

United States District Court, E.D. New York.

Dec. 8, 1987.

---

Paul, Weiss, Rifkind, Wharton & Garrison by Andrew Plunkett, New York City, for plaintiffs.

Estroff, Waldman & Poretsky by Jonathan Siegfried, New York City, for defendant SRM.

Davis, Markel & Edwards by William F. Haigney, New York City, for defendant RCA.

Parker Chapin Flattau & Klimpl by Genevieve A. Harris, New York City, for defendant Schwartz.

## CORRECTED MEMORANDUM & ORDER

KORMAN, District Judge.

Plaintiffs Arlington Park Racetrack Ltd., and Tele–Conference Corporation (collectively "Arlington") brought this diversity action against defendants SRM Computers, Inc. ("SRM"), Joseph L. Schwartz ("Schwartz"), SRM's vice-president, and RCA American Communications, Inc. ("RCA"). Arlington seeks, *inter alia*, rescission of a so-called novation agreement by which it agreed to assume certain debts of SRM which were owed to RCA. RCA counterclaimed against Arlington, seeking enforcement of the agreement. RCA has now moved for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure seeking judgment against Arlington on its counterclaims and dismissing Arlington's claims against RCA.

### I. *The Facts*

Viewing the record in the light most favorable to Arlington, the nonmoving party, the material facts are as follows: RCA operates Satcom 1–R, a communications satellite, as a common carrier. The satellite contains a device called a transponder which receives signals transmitted from a particular location on earth and then redirects them to a different location. On April 4, 1983, RCA agreed to provide SRM with transponder service (the so-called "Transponder Lease"). The rights and obligations of the parties to the Transponder Lease were governed by a tariff filed with the Federal Communications Commission. Pursuant to the terms of the tariff, the cost of this service was $62,500.00 per month in 1983 and $66,666.67 per month for 1984–88. The tariff provided that the lessee was permitted to terminate the Transponder Lease upon thirty days written notice and the lessor could terminate the Transponder Lease if payment was not received within thirty days after payment was due (Plunkett Aff. Ex., 5; Reinert Aff. ¶ 19 and Ex. E).

In the fall of 1983, SRM approached Arlington with a proposal to begin a data transmission service using SRM's leased transponder. Arlington advanced substantial funds to SRM to fund this proposed data transmission business. SRM's data transmission business, however, did not develop into a viable enterprise. In May, 1984, Arlington told SRM that it would not continue with this venture and that it wanted SRM to assign the Transponder Lease to Arlington as security for the funds already advanced to SRM. SRM, however, did not assign the Transponder Lease to Arlington at that time, although it ultimately agreed to do so in November, 1984.

At that point, November 1, 1984, SRM was in arrears on its payments to RCA under the Transponder Lease in the amount of $478,763.78. RCA had allowed these arrearages to accumulate without terminating the lease because there was a "transponder glut" at the time (Reinert Tr. 18) and because there was little to be lost

in working with SRM "in hope that they would find a way to pay" (Reinert Tr. 41).

This "business judgment" (Reinert Tr. 41) was apparently vindicated on November 8, 1984, when Stanley Rintel, an SRM executive, arrived at RCA with a proposed "assignment and assumption agreement" between SRM and Arlington (the "Agreement"). The Agreement provided in pertinent part as follows:

1. Assignor [SRM] hereby assigns and transfers to Assignee [Arlington] all of its right, title and interest in, to and under the Transponder Lease.

2. Assignee hereby accepts Assignor's assignment of all of its right, title and interest in, to and under the Transponder Lease.

3. Assignee hereby assumes all of Assignor's obligations under the Transponder Lease arising from and after April 4, 1983, including any and all obligations to make lease payments thereunder. Assignee also hereby assumes the performance of all of the terms and covenants of the Transponder Lease required to be performed by the lessee thereunder.

4. Assignee does hereby indemnify and hold the Assignor harmless from any and all damage and liability arising out of any default or failure on the part of the Assignee to perform the obligations of the lessee under the terms of the Transponder Lease as above set forth and to make all lease payments to be made by the lessee under the terms of the Transponder Lease as above set forth.

Reinert Aff., Ex. A.

This part of the Agreement between Arlington and SRM was executed only by SRM at the time it was presented to RCA. At the bottom of the signature page of the Agreement, after the place for the signatures of the principals of Arlington and SRM was a paragraph which read in draft as follows:

RCA Corp. hereby consents to the foregoing Assignment and Assumption of the Transponder Lease and hereby releases SRM Computers, Inc. from any and all of its obligations under the Transponder Lease, including any and all obli-gations to make lease payments thereunder, arising at any time after April 4, 1983.

This paragraph, which will be referred to (for the sake of convenience) as the novation, was altered by Donald Reinert ("Reinert"), RCA's Director of Cable Services. Specifically, to the extent here relevant, he added in handwriting the following language which was ultimately initialled by representatives of SRM, Arlington and RCA: "[S]uch release [of SRM] based on Assignee['']s assumption of all lease payment obligations after April 4, 1983" (Reinert Aff., Ex. A).

Reinert then told Rintel to obtain Arlington's signature to the Agreement. Arlington alleges, and it is assumed as true for purposes of this motion, that Schwartz of SRM obtained Arlington's consent to the Agreement by fraudulently representing that no liabilities existed to RCA for Transponder Lease payments. On December 12, 1984, Arlington signed and returned the Agreement to Schwartz with a transmittal letter from its President, Joseph Joyce, stating that the "novation agreement ... is executed on your assurance that all payments have been made to RCA to date" (Plunkett Aff., Exh. 18). Arlington did not advise RCA of the "assurance" which prompted it to execute the novation agreement nor did it undertake any further investigation to satisfy itself that all payments had been made to RCA to date.

On December 17, 1984, Joseph Schwartz, the Vice President of SRM, wrote a letter acknowledging receipt of the Agreement and the transmittal letter. The last paragraph of the Schwartz letter "confirms the information previously given to you that the lease payment due and owing to RCA under the transponder lease is $544,250.49 as of the date of the Assignment and Assumption of Transponder Lease" (Reinert Aff., Ex. F). This reply, which flatly contradicted the Joyce transmittal letter, did not come to the attention of Arlington's President until mid-January.

Subsequently, on February 20, 1985, after Arlington paid for the use of the transponder for that month, RCA asked Arling-

ton to pay the arrearages due from July 13, 1983, through January 1, 1985, in the amount of $612,097.12 (Plunkett Aff., Ex. 15). On March 14, 1985, Arlington informed RCA that it did not intend to pay those arrearages. This oral notice was not reduced to writing until April 30, 1985, when Arlington gave RCA written notice of its intent to repudiate its obligations for past and future lease payments (Reinert Aff., Ex. D). In the interim, Arlington paid RCA for use of the transponder in March.

On May 5, 1985, RCA wrote to Arlington that pursuant to the tariff, the Transponder Lease could be terminated by either party only upon thirty days written notice and that the Transponder Lease would therefore be considered terminated as of May 30, 1985, if Arlington did not request otherwise (Reinert Aff., Ex. E). Arlington made no such request.

## II. *The Complaint and Counterclaims*

Counts one and three of the Arlington complaint are directed at RCA. Count one of the complaint seeks to cancel and rescind the Agreement on the basis of Schwartz' allegedly fraudulent representations which Arlington claims induced it to enter the Agreement. Count three of the complaint seeks a declaratory judgment that RCA is estopped from asserting that Arlington is liable for any arrearages outstanding as of the time the Agreement was signed. RCA asserts five counterclaims against Arlington. The first and third counterclaims assert that Arlington is liable under the agreement for the arrearages outstanding at the time the Agreement was signed. The second and fourth counterclaims seek payment pursuant to the Agreement for transponder service received after the Agreement was signed until the Transponder Lease was terminated. The fifth counterclaim seeks to recover these same amounts on the basis that there was an implied agreement to pay for services received.

RCA has now moved for summary judgment on its first four counterclaims in the amount of $745,430.46, which includes all arrearages due and owing from SRM at the time of the assignment of the Transponder Lease and the balance of payments due after the assignment. RCA also seeks, in the alternative, summary judgment against Arlington on its second and fourth counterclaims for $200,001.00. The alternative relief relates only to the payments due after the assignment of the Transponder Lease.

## III. *Discussion*

The language which appears at the bottom of the signature page of the "Assignment and Assumption of [the] Transponder Lease" forms the basis for RCA's motion for summary judgment. Specifically, RCA there agreed, *inter alia*, to release SRM "from any and all obligations under the Transponder Lease, including any and all obligations to make lease payments thereunder, arising at any time after April 4, 1983, *such release based on Assignees assumption of all lease payment obligations after April 4, 1983*" (Reinert Aff., Ex. A) (emphasis supplied). The underscored language, as observed earlier, was handwritten by the principal who signed on behalf of RCA.

This paragraph, which was initialed by principals of Arlington, RCA and SRM, is alleged by RCA to constitute a novation, *i.e.,* "[t]he substitution by mutual agreement of one debtor for another ... whereby the old debt is extinguished." *Blacks Law Dictionary* 1212 (4th ed. 1968). Because it is a "novation", it is said to be enforceable by RCA even if SRM—its sole beneficiary—obtained Arlington's consent to it by fraudulently representing that there were no outstanding payments due as of the date of the agreement.

While the parties have chosen to frame the argument in terms of *whether* a novation obtained by fraud may be enforced by an innocent creditor, the real question is *why* such an agreement should be enforced. Regardless of the label, the facts are assumed to be these: Solely in return for the "release" of what RCA understood to be an uncollectible debt due and owing from SRM, Arlington agreed to assume SRM's obligation. Moreover, however negligent Arlington may have been, it was

induced by the fraud of SRM to enter into this so-called novation agreement.

The arguments offered in support of the enforceability of the so-called novation are that RCA was innocent of any wrongdoing in inducing Arlington to assume SRM's obligations, RCA "paid" for Arlington's assumption of liability by agreeing to release SRM from its obligation to pay the past due arrearages and that Arlington failed to exercise due diligence in relying on SRM's representations. RCA also argues that, even if the defense of fraud is otherwise available, Arlington failed to promptly repudiate the agreement when it learned of the alleged fraud and it thereby affirmed the fraudulently induced promise.

■ These arguments are not sufficiently persuasive, in the context of the circumstances here, to justify summary judgment on RCA's full claim for arrearages due and owing at the time of the assignment of the Transponder Lease, although it seems clear that there are no material issues of fact which preclude summary judgment for the balance of payments due after the assignment until it was terminated effective May 31, 1985.

## A. The Arrearages

### 1. The "Innocence of RCA"

RCA asserts that it was not responsible for any fraudulent representations made by SRM to Arlington and that it is entitled to enforce a promise which it obtained in good faith. The principal difficulty with this argument is that it ignores the difference between the present case, which involves what Dean Prosser has described as an "equitable defense" to the enforcement of a contract procured by fraud, and other cases in which a defrauded party seeks to obtain damages for fraud or other affirmative equitable relief. W. Prosser, *Law of Torts*, § 105, at 690 (4th ed. 1971).

The first category of cases from which the present case is distinguishable is a cause of action at law for damages. Because an action in tort for fraud involves some form of culpable misconduct by the defendant, a cause of action for fraud obviously would not lie against a party to a contract who was innocent of any misconduct. On the other hand, where a party to a contract seeks to invoke an equitable defense to the enforcement of a contract, "[s]ome courts have regarded it as a form of rescission in equity, permitting [him] to set up innocent misrepresentation or even mere mistake...." Prosser, *Torts, supra*, at 690.

The New York Court of Appeals has explicitly drawn a distinction in the nature of proof "between the action in rescission and the action for damages based upon fraud and deceit." *Seneca Wire & Mfg. Co. v. Leach & Co.*, 247 N.Y. 1, 8, 159 N.E. 700 (1928). Specifically, it has held that, unlike an action in tort for fraud, where "there must be proof of willful and fraudulent misrepresentation, knowingly made, resulting in damage," rescission may be had even where the party making the representation was entirely "[i]nnocent" of any culpable intent to mislead or deceive. *Id.* at 8, 159 N.E. 700. Indeed, New York recognizes a cause of action for rescission based on a unilateral mistake of fact which is not dependent on any misrepresentation of fact whether negligent or willful. 37 N.Y.Jur. *Mistake, Accident, or Surprise*, § 7 (1964). Accordingly, while there is no evidence that RCA was a party to the fraud or that it was aware of the fraudulent representations made by SRM,[1] the absence of any culpable intent is not by itself sufficient to defeat the equitable defense of rescission based on the fraud of SRM.

The present case is also distinguishable from another category of cases on which RCA relies, *i.e.*, where a defrauded party seeks some form of affirmative relief such as restitution. "The duty of restitution or

---

1. There is evidence in the record suggesting that RCA had reason to know that Arlington's assent to the novation was an act of colossal stupidity. What else could be said of a transaction whereby Arlington apparently agreed to assume a debt in excess of $500,000 as part of an arrangement to obtain the Transponder Lease when such a lease could have been obtained directly from RCA without cost.

a quasi-contract rests upon the equitable principle that that person shall not be allowed to enrich himself unjustly at the expense of another. With few exceptions, unjust enrichment is a prerequisite for enforcement of the doctrine of restitution; and if there is no basis for unjust enrichment, there is no basis for restitution." 50 N.Y.Jur. *Restitution and Implied Contracts*, § 3, at 151–52 (1966). Obviously where the party from whom restitution is sought has acted in good faith and obtained money in return for valuable consideration, these facts alone preclude the requisite finding of "unjust enrichment." On the other hand, the "innocence" or good faith of the party from whom restitution is sought would not necessarily preclude the defense of rescission with respect to the enforcement of future obligations.

*Alden Auto Parts Warehouse, Inc. v. Dolphin Equipment Leasing Corp.*, 682 F.2d 330 (2d Cir.1982), upon which RCA relies is illustrative. The plaintiff in that case sought to recover from the defendant monies it paid to lease certain equipment in the mistaken belief that the defendant was the owner of the equipment and was entitled to the lease payments.[2] Plaintiff was allegedly deceived into making the payments by the fraudulent representations of a third party.

The Court of Appeals held that, even if plaintiff was induced by fraud into making the payments to the defendant, it could not obtain restitution because the plaintiff was not induced to make the payments by the fraudulent representations of the defendant. Quoting from 50 N.Y.Jur. *Restitution and Implied Contracts*, § 22 (1966), the Court of Appeals observed that " 're-covery [by way of restitution] is ordinarily denied as against a third person who, as a result of a mistake in a transaction between two other persons, receives a payment from one of them in good faith in the ordinary of business and for a valuable consideration.' " 682 F.2d at 333. The plaintiff was unable to show unjust enrichment in *Alden* because the defendant had obtained the money in good faith and in return for valuable consideration. Under these circumstances, it could hardly be said to be "against equity and good conscience to permit the defendant to retain what [was] sought to be recovered." 50 N.Y. Jur. *Restitution and Implied Contracts, supra,* § 1, at 131.[3]

Moreover, the strict rule in New York and elsewhere against allowing restitution of money paid in cash (or through negotiable instruments) from holders in due course, rests on the policy consideration that it is "absolutely necessary for practical business transactions that the payee of money in due course of business shall not be put upon inquiry at his peril as to the title of the payor. Money has no earmark.... It would introduce great confusion into commercial dealings if the creditor who receives money in payment of a debt is subject to the risk of accounting therefor to a third person who may be able to show that the debtor obtained it from him by ... fraud." *Stephens v. Board of Education,* 79 N.Y. 183, 187 (1879); *Ball v. Shepard,* 202 N.Y. 247, 254–55, 95 N.E. 719 (1911).

The "simplest illustration of this principle" is the case "where the plaintiffs certified checks which had been obtained by fraud, were deposited with the defendant bank by the person committing the fraud ... and were paid by the bank on presentation." *Ball v. Shepard, supra,* 202 N.Y. at

---

**2.** The lease payments which plaintiff in *Alden* sought to recover—if it was successful in its effort to rescind the lease—were actually made to an assignee of the defendant.

**3.** The Court of Appeals in *Alden* also cited Section 28 of the *Restatement of Restitution* in support of the statement that: "The fact that Alden was led into its mistake by Intertel's fraud does not give Alden a right to rescission against [defendant] since the latter was in no way a party to the fraud." 682 F.2d at 333. Comment c to Section 28, however, limits its applicability to cases in which restitution is sought. Specifically it reads as follows: "The rule stated in this section has no application where the fraud or innocent misrepresentation results only in a promise being given, nothing being transferred, even though there can be proceedings for the rescission of the contract, or a defense to an action upon the contract...." *Restatement of Restitution,* § 28, Comment c (1937).

255, 95 N.E. 719. The plaintiffs could not recover because they were not cheated by the defendant bank which came into the money in the ordinary course of business, " 'in a form as current as if it had been bank notes or United States currency.' " If this money could be followed because "the party who paid it procured it fraudulently, 'the transaction of business must stop, for no inquiry and no precaution could guard the receiver from responsibility.' " *Id.* at 255, 95 N.E. 719 (quoting *Justh v. National Bank of Commonwealth,* 56 N.Y. 478, 483 (1874)).

*DiFranco v. Steinbaum,* 177 S.W.2d 697 (Mo.App.1944), a case upon which RCA also relies heavily, involved an arguably reasonable extension of the principle discussed above. The defendant there, Morris Steinbaum, claimed that, as part of an agreement with the principal of a financially troubled corporation, W.R. Stone & Co., Steinbaum agreed to pay certain debts of the latter. The debts were represented to him to be no more than $5,000. Steinbaum issued a check for $670.00 to the plaintiff, among others, who was a bona fide creditor of W.R. Stone & Co. Before the check cleared, Steinbaum learned that he had been mistaken in his understanding of the full extent of the liabilities of W.R. Stone & Co. Steinbaum then stopped payment on the check.

A careful reading of the opinion in *DiFranco* indicates that the Court of Appeals there, like the New York case cited above, viewed the check as equivalent of a cash payment. Specifically, after observing that "a check is a negotiable instrument and imports a valuable consideration" and that "[m]erely stopping payment on the check did not absolve defendant from his obligation thereon," the Court of Appeals in *DiFranco* continued:

> At the time defendant gave plaintiff the check mentioned he did not post-date the same, nor did he do or say anything whatsoever to indicate anything other than an intention that it should be taken as payment for the debt owed by Stone & Co. to plaintiff. Fraud is not even claimed, nor is there anywhere in the record the slightest suggestion or intimation of fraud or misrepresentation on the part of plaintiff in the transaction. There mere fact that defendant learned, after delivering the check to plaintiff, that the debts of Stone & Co. were much larger than he anticipated is wholly immaterial in so far as his obligation to plaintiff on the check is concerned. *The delivery of the check to plaintiff was clearly understood by him at the time to be in payment of Stone & Co.'s debt to plaintiff and the transaction was completed by the delivery of the check. It remained only for the check to be presented to the bank on which it was drawn, within a reasonable time to be honored in full.* [emphasis supplied].

177 S.W.2d at 701.

There is undeniably language in *DiFranco* to the effect that the fraud of one not a party to a novation is not a defense to its enforcement by an innocent creditor. This language appears to go beyond that necessary to decide the case [4] and appears to be contrary to New York law. *In re Tagliabue's Estate,* 123 Misc. 666, 206 N.Y.S. 222 (Surr.Ct.Suffolk Co.1924). The more compelling rationale supporting the result in *DiFranco* is that the check was the equivalent of a cash payment and was so understood by the parties. Indeed, it was sheer fiction to assume that the plaintiff in *DiFranco* had agreed to release W.R. Stone & Co. from its debt solely in return for Steinbaum's promise—as embodied in the check—to pay the debt. The debt of W.R. Stone & Co. was extinguished when Steinbaum paid it with a check that the parties, like the Missouri Court of Appeals, viewed as the equivalent of cash. [5] Accordingly,

---

4. The Court of Appeals in *DiFranco* previously observed: "Fraud is not even claimed...." 177 S.W.2d at 701.

5. The plaintiff in *DiFranco* gave the following testimony:

"Q. And did you accept this check from Mr. Steinbaum in payment of that [$670.00 debt]? "A. Yes, sir." 177 S.W.2d at 699.

Steinbaum was not entitled to obtain restitution via the self-help of a stop payment order or to assert an equitable defense of rescission.

The policy considerations underlying *Di-Franco* and *Ball* and "the equitable prerequisite" for obtaining the relief at issue in *Alden*, are simply not present in this case. Rather than seeking the aid of equity in contravention of sound considerations of policy and to the prejudice of an innocent party, Arlington simply seeks to avoid responsibility for a promise that was induced by fraud under circumstances where the innocent creditor has either not been placed in a more disadvantageous position than it would have been (had the fraudulently induced promise not been made) or where it is possible to repair any damage suffered by the innocent creditor by holding Arlington responsible for any such damage.[6]

### 2. *The Payment of "Valuable" Consideration*

The principle that protects an innocent person who purchases commercial paper in good faith and for value from one who obtained it from the original owner by a misrepresentation has been extended by Section 164(2) of the Restatement (Second) of Contracts to all contracts. Specifically, it applies even where the innocent person deals directly with the recipient of the misrepresentation if the innocent person gives value or relies materially on the transaction before learning or acquiring reason to know of the representation. Section 164(2), which creates this exception to the rule that an aggrieved party has an unqualified right to repudiate a contract induced by fraud, reads as follows:

> If a party's manifestation of assent is induced by either a fraudulent or a material misrepresentation by one who is not a party to the transaction upon which the recipient is justified in relying, the contract is voidable by the recipient, unless the other party to the transaction in good faith and without reason to know of the misrepresentation either gives value or relies materially on the transaction.

Setting aside the fact that the fraudulent representation here was made by a party to the transaction, which raises a question about the applicability of this exception, there is difficulty in finding that RCA gave "value" or relied materially on the transaction. The only "value" RCA paid for the fraudulently induced promise was the release of an uncollectible debt which RCA allowed to accumulate because it was concerned that SRM, if pressed to pay, would not survive and because the "transponder glut" made it possible to carry SRM without foregoing other potential lessees.[7]

While the release of this uncollectible debt, solely benefiting the party which fraudulently induced Arlington to execute the so-called novation, may constitute consideration sufficient to support a simple contract (U.C.C. § 1–201(44)(a)), thus constituting "value" as the term is used in Section 164(2) of the Restatement (Second) of Contracts, it hardly seems to provide a sufficient basis to deny an equitable defense which would otherwise be available. Judge O'Brien said it well when he wrote in *Page v. Krekey*, 137 N.Y. 307, 33 N.E. 311 (1893):

> Sometimes releases, discharges and other instruments are procured by the fraud of a third person, without the knowledge or participation in the fraud of the party to be benefited, who, nevertheless, will not be permitted to reap the benefit of a fraud, though he was himself innocent. The case of *Bedell v. Bedell* (37 Hun;

---

**6.** Indeed, even the most persuasive authorities cited by RCA would not deny Arlington the defense of fraud *solely* because RCA was innocent of any wrongdoing. *Restatement (Second) Contracts*, § 164(2) (1981); 12 S. Williston, *Contracts*, § 1518 at 584 (3d ed. 1970).

**7.** RCA had classified SRM's account as "critical" denoting an account where "service has been disconnected due to nonpayment" or "collection efforts disclose that the customer is experiencing serious financial difficulties" (Plunkett Aff., Ex. 4). Indeed, one RCA employee wrote in September 1984 that RCA's Manager of Financial Operations and its Manager of Credit and Collections were both "very doubtful" that SRM will survive (Plunkett Aff., Ex. 6; Amentt Tr. 35).

419) is an example of this class of cases. The decisions in these cases rest upon principles obviously just and reasonable. When the fraudulent act is not imputable to the person claiming the benefit of the instrument, upon the principle of agency, he is generally debarred from enforcing it upon the ground of the fraudulent origin of the paper and the fact that he has lost nothing upon the faith of it. *Id.* at 312, 33 N.E. 311.

Accordingly, in the absence of clear New York law so requiring it, Section 164(2) should not be applied in the peculiar circumstances here. On the contrary, the salutory rule (to be discussed presently) that, where one of two innocent parties must suffer as the result of the fraud of another, it is the one whose conduct made the fraud possible, provides for more equitable method of resolving cases of this kind. *See, e.g., Page v. Krekey, supra,* 137 N.Y. at 312–313, 33 N.E. 311; *County Trust Co. v. Berish,* 4 A.D.2d 777, 778, 165 N.Y.S.2d 548 (2d Dept.1957); *cf. Alden Auto Parts Warehouse, Inc. v. Dolphin Equipment Leasing Corp., supra,* 682 F.2d at 334 (Leval J., concurring).

### 3. *Arlington's Negligence*

RCA argues that Arlington is precluded from raising the defense of fraud because Arlington failed to exercise due diligence. In an action in tort for fraud in New York, the exercise of due diligence is always said, and sometimes held, to be a precondition of the justifiable reliance. *Mallis v. Bankers Trust Co.,* 615 F.2d 68, 80–81 (2d Cir.1980), *cert. denied,* 449 U.S. 1123, 101 S.Ct. 938, 67 L.Ed.2d 109 (1981); *Black v. Chittenden,* 69 N.Y.2d 665, 511 N.Y.S.2d 833, 503 N.E.2d 1370 (1986); *cf. Citibank, N.A. v. Plapinger,* 66 N.Y.2d 90, 94–96, 495 N.Y.S.2d 309, 485 N.E.2d 974 (1985). This element is necessary to establish, as in the case of all torts, a "causal connection between the wrongful conduct and the resulting damage". Prosser, *Torts, supra,* § 108. Moreover, the changing nature of the standard of diligence required to satisfy the element of justifiable reliance has reflected differences of attitude regarding a plaintiff's obligation to make his own investigation before seeking damages as a result of his reliance on the representations of another. 2 F. Harper, F. James & O. Gray, *The Law of Torts,* § 7.12, at 455–58 (2d ed. 1986).

Where the issue involves an effort to avoid the enforcement of a promise induced by fraud, rather than an effort to obtain damages incurred as a result of fraudulent representations, the determinative factor should not be whether the party asserting the defense was foolish, stupid or negligent. While it is only fair to hold one "responsible for harm to others if it is caused by his 'folly' or his negligent mistake ... his responsibility need not be carried so far as to permit others to profit by reason of his mistake." 3 A. *Corbin on Contracts,* § 606, at 647–648 (1960); *De Paola v. City of New York,* 90 Misc.2d 379, 381, 394 N.Y.S.2d 525 (Sup.Ct.Bronx Co. 1977); *Balaban–Gordon Co. Inc. v. Brighton Sewer District No. 2,* 67 Misc.2d 76, 323 N.Y.S.2d 724 (Sup.Ct.Monroe Co.1971), *aff'd,* 41 A.D.2d 246, 342 N.Y.S.2d 435 (4th Dept.1973).

Indeed, where rescission or other equitable relief is sought on the basis of mistake, "mere negligence does not necessarily bar relief in equity from the consequences of mistake." 37 N.Y.Jur. *Mistake, Accident, Or Surprise,* § 3, at 520–521 (1966). On the contrary, the jurisdiction to relieve from the consequences of mistake "is freely exercised when no one will be put in a worse position thereby." *Id.* at 521; *Jones Chemicals, Inc. v. City of Binghamton,* 26 A.D.2d 710, 711, 271 N.Y.S.2d 507 (3d Dept.1966), *aff'd.,* 20 N.Y.2d 808, 284 N.Y.S.2d 702, 231 N.E.2d 288 (1967). Professor Corbin has observed in a similar context:

> It is frequently said, also, that rescission will be denied to one who has negligently made a mistake, if the other party was innocent and has materially changed his position. It is better to say, however, that such relief will be denied unless the other party is put in statu quo. In some cases, at least, in spite of a material change that has occurred, the original

position of the other party can be substantially restored by money payments and other equitable adjustments. Like the former Chancellors, the courts of today have ample power to mold their decrees as justice may require in the particular case. They are no longer to follow old decisions that were rendered under the inflexible procedure of the ancient common law. (Footnotes omitted).

3 *Corbin on Contracts, supra,* § 606, at 649–652.

■ There is no logical reason to apply a contrary rule where, as here, the asserted negligence involves the failure to investigate a fraudulent representation and where the successful assertion of that defense will revive SRM's obligation to Arlington. On the other hand, the applicability of the analysis suggested by Professor Corbin does not relieve Arlington of all responsibility. Arlington is responsible to RCA to the extent that RCA has been prejudiced in its ability to collect the arrearages due as a result of any post-assignment deterioration of SRM's financial condition. This is so because, however innocent its conduct, Arlington enabled SRM to perpetuate a fraud on RCA.

Specifically, RCA released SRM from its obligation to pay past arrearages and looked to Arlington for payment. RCA did so in reliance upon an agreement which, on its face, obligated Arlington to assume responsibility for the arrearages. Indeed, because he so understood the language of the agreement, which he described as a "novation", Arlington's President returned the executed copy to SRM with a transmittal letter stating that it was being "executed on your assurance that all payments have been made to RCA to date" (Plunkett Aff., Ex. 18). Arlington, however, did not give RCA similar contemporaneous notice of its understanding. Accordingly, Arlington is responsible for any prejudice RCA suffered in reliance on the novation. "[W]here one of two innocent parties must suffer, he who has put it in the power of a third

person to commit the fraud must sustain the loss." *Page v. Krekey,* 137 N.Y. 307, 313, 33 N.E. 311 (1893); *County Trust Co. v. Berish,* 4 A.D.2d 777, 778, 165 N.Y.S.2d 548 (2d Dept.1957); *cf. Alden Auto Parts Warehouse, Inc. v. Dolphin Equipment Leasing Corp., supra,* 682 F.2d at 334 (Leval, J. concurring).

■ The foregoing discussion has assumed that what is at issue is simple negligence. "[A]t some point negligence can become sufficiently gross as to approach bad faith, as where willful ignorance is involved." *Corbin on Contracts,* § 606, at 724 (Kaufman Supp.1984); *Restatement (Second) Contracts,* § 172 (1981). If Arlington intentionally avoided making inquiry which it had reason to know would disclose the true facts in order to obtain what it foolishly perceived to be the benefits of the assignment of the lease, then it can hardly be said to have relied on any misrepresentation of SRM. Accordingly, it would not be permitted to assert an equitable defense to the enforcement of the so-called novation.

The latter two issues, the extent and nature of the prejudice to RCA and the issue of conscious avoidance, involve issues which should be resolved after a trial.[8]

### 4. *The Delay in Repudiation*

RCA finally argues that Arlington's "receipt and use of the transponder without objection for over two months constitutes an affirmation of the agreement." RCA Memo. 32. RCA correctly observes "that the decision to rescind a contract allegedly procured by fraud must be promptly made." *Id.* Although the cases do not often provide a clear standard for judging whether rescission has been "promptly" sought, delay sufficient to bar rescission is usually "accompanied by other factors such as continued enjoyment of benefits or a change in position by others." 3 *Corbin on Contracts, supra,* § 606, at 656.

The brief delay here in giving notice of intent to repudiate the contract (from mid-

---

8. While RCA asserts that Arlington's defense of fraud is implausible as a matter of law, the issue is plainly one of credibility. Summary judgment is, therefore, inappropriate. *Millerton Agway Co-op v. Briarcliff Farms,* 17 N.Y.2d 57, 63–64, 268 N.Y.S.2d 18, 215 N.E.2d 341 (1966).

January to mid-March) did not operate to the prejudice of RCA in collecting any sums due and owing from SRM for that period or for past arrearages. Indeed, RCA did not bill Arlington for the arrearages until mid-February. Moreover, Arlington paid RCA for use of the transponder for February and March and, for reasons to be detailed, will be liable for all payments due until the contract was terminated.

■ Under these circumstances, the delay alone should not be sufficient to preclude the defense asserted by Arlington. This is particularly so because the present case appears to be one of those in which Arlington could only elect partial rescission of the so-called novation. Such rescission may be had "where the ground of rescission relates merely to a part of a severable contract; and in certain instances, where necessary to just results, courts have shown some inclination to treat contracts as severable for rescission purposes." 60 N.Y.Jur.2d *Fraud and Deceit*, § 195 (1987); 17 Am.Jur.2d *Contracts*, § 488 (1964); *Ripley v. International Railways of Central America*, 8 N.Y.2d 430, 437, 209 N.Y.S.2d 289, 171 N.E.2d 443 (1960); *Kaplan v. Keith*, 60 Ill.App.3d 804, 806, 18 Ill.Dec. 126, 128, 377 N.E.2d 279, 281 (1978); *Keeshin v. Levin*, 31 Ill.App.3d 790, 798, 334 N.E.2d 898, 906 (1975).

The record shows that RCA would have leased the transponder to Arlington or assented to the assignment of SRM's lease without Arlington's assumption of any of SRM's past obligations.[9] Arlington was concededly prepared to lease the transponder if it could do so without assuming responsibility for arrearages. Moreover, under terms of the so-called novation only RCA's assent to the "release" of SRM's obligations—not to the assignment of the lease—was contingent on Arlington's assumption of SRM obligations. Under these circumstances, the post-assignment leasing of the transponder was consistent with Arlington's right to seek only partial rescission and not inconsistent with the repudiation of the obligation to pay the arrearages.

### B. *The Post Assignment Payments*

■ RCA alternatively seeks to recover those payments due after the date of the assignment of the lease. To this relief it is plainly entitled. Whatever misapprehension Arlington had as to the arrearages it was assuming, it is undisputed that Arlington was ready and willing to assume SRM's obligation for future lease payments following the assignment of the lease (Plunkett Aff., Ex. 18). Moreover, it is likewise undisputed that, after being put on notice with respect to the true facts regarding the arrearages, Arlington made lease payments to RCA in February and March of 1985. Accordingly, even if Arlington could have sought total rescission of the novation, these acts were inconsistent with the election of that remedy.

Under these circumstances, whatever defense Arlington has to to RCA's claim for arrearages due at the time of the assignment, it plainly has no equitable defense to RCA's claim for payments after the assignment of the lease—specifically for January—May, 1985. Indeed, in its memorandum of law in opposition to RCA's motion for summary judgment for payments due after the assignment until the lease was terminated, Arlington does not rely on any asserted right of rescission. Instead, it makes a series of meritless and disingenuous arguments.

Arlington argues first that "RCA has offered absolutely no evidence that it made the transponder available to Arlington prior to (or after, for that matter) February 1985, or that it billed Arlington prior to February 1985." Arlington Memo. 50. Because Arlington paid the monthly payments for March and April 1985, the payments themselves constitute an admission that the transponder was made available after February, 1985. This aside, it is unclear why

---

**9.** In 1984 the supply of transponders significantly exceeded demand for this service. Specifically, citing the deposition testimony of D. Reinert, the Director of Cable Services at RCA, Arlington asserts RCA had an inventory of unused transponders that RCA "could not [have] refuse[d] to lease" to Arlington had it applied (Reinhert Tr. 133).

RCA would have the burden of offering any such proof. Arlington accepted the assignment of the Transponder Lease and if RCA failed to make the transponder available, it would constitute a defense to Arlington. There is, however, no proof offered that would sustain any such defense. Moreover, the suggestion that Arlington is not liable for the January payment, because it did not receive a bill, borders on the absurd.[10]

Arlington's remaining arguments are of the same order. Arlington claims that, as of March 14, 1985, "Arlington gave notice that it would not be responsible for any future lease payments (Reinert Tr. 156–157)." Arlington Memo. 50. Accordingly, it claims that it was not responsible for any lease charges in April and May. The cited pages of the transcript of the Reinert deposition do not support the proposition that "Arlington gave notice it would not be responsible for any future lease payments." The transcript supports only the claim that on March 14th RCA was advised that Arlington did not intend to pay any "arrearages" (Reinert Tr. 158). Similarly, the deposition testimony of Arlington's President, which Arlington does not cite in this part of its memorandum, was that "we informed [RCA] that we did not believe that we were liable" for future rent (Joyce Tr. 85).

This statement hardly amounts to notice of a refusal to make future lease payments or an intention to terminate the lease. More significantly, it does not constitute the thirty days advance written notice which RCA asserts (without apparent contradiction) the tariff required. Indeed, a few days later—on March 18, 1985, Arlington mailed RCA a check for full payment for the month of March and it was not until April 30, 1987, that Arlington gave RCA written notice "that it should not look to Arlington for past or future rental payments pursuant to the Transponder Lease."

Under these circumstances, there are no material issues of fact precluding summary

judgment on RCA's claim for the payments due for January, April and May 1985.

### Conclusion

RCA's motion for summary judgment against plaintiffs on its first four counterclaims in the amount of $745,430.46 is denied. RCA's alternative motion for summary judgment against plaintiffs on its second and fourth counterclaims for $200,001.00 plus interest and costs is granted.

---

10. The F.C.C. tariff cited for this argument simply permits RCA to discontinue service "[u]pon non-payment of any sum owing to the company for more than thirty days beyond rendition of the bill for such service ..." (Plunkett Aff. Ex. 5).